738 F.2d 1509
 1984-2 Trade Cases 66,101, 17 Fed. R. Evid. Serv. 600
 ASPEN HIGHLANDS SKIING CORPORATION, a Delaware Corporation,
Plaintiff-Appellee, Cross-Appellant,
v.
ASPEN SKIING COMPANY, a Colorado General Partnership,
Substituted Defendant-Appellant, Cross-Appellee.
 Nos. 82-1407, 82-1424.
 United States Court of Appeals,
Tenth Circuit.
 July 13, 1984.
 
 Tucker K. Trautman, Denver, Colo. (John H. Evans and Owen C. Rouse of Ireland, Stapleton & Pryor, P.C., Denver, Colo., were also on brief), for plaintiff-appellee, cross-appellant.
 Richard M. Cooper, Washington, D.C. (Edward Bennett Williams and Harold Ungar of Williams & Connolly, Washington, D.C., and David G. Palmer and William W. Maywhort of Holland & Hart, Denver, Colo., of counsel, were also on brief), for substituted defendant-appellant, cross-appellee.
 Before HOLLOWAY, DOYLE and SEYMOUR, Circuit Judges
 HOLLOWAY, Circuit Judge.
 
 
 1
 Defendant Aspen Skiing Company operates skiing facilities at three of the four skiing mountains in the Aspen, Colorado area, Ajax Mountain, Buttermilk and Snowmass. Plaintiff Aspen Highlands Skiing Corporation operates skiing facilities at the fourth mountain, Aspen Highlands.
 
 
 2
 For many years, plaintiff and defendant individually offered a wide variety of ski-lift tickets. Defendant's ski-lift tickets were interchangeable among its three Aspen facilities. From the 1962-63 ski-season through the 1971-72 season, plaintiff and defendant offered a joint multi-day ski-lift ticket which could be used at any of the four Aspen mountains. Revenues from the joint ticket were divided through coupons used to measure actual use at the four mountains. II App. 488-49.[1] After a one-year discontinuance of the joint ticket during 1972-73, the joint ticket was reinstituted in 1973-74 through 1976-77. Profits were divided on the basis of surveys of actual use. Plaintiff received 17.5% of the net revenues from the sale of four-area tickets during 1973-74, 18.5% in 1974-75, 16.8% in 1975-76, and 13.2% in 1976-77.
 
 
 3
 Defendant offered to continue the joint ticket for 1977-78 if plaintiff would accept a 13.2% fixed percentage of the revenues. I App. 90-91. Plaintiff objected to this percentage because it was based on the survey for 1976-77, which plaintiff contended was a ski-season marked by below average amounts of snowfall and an unusually low number of skiers visiting the Aspen area. Id. at 91. Although plaintiff wanted revenues to be divided on the basis of actual usage, it eventually accepted a fixed 15% of revenues for 1977-78. Id. at 92-93.
 
 
 4
 Defendant offered to continue the joint ticket for 1978-79 if plaintiff would accept 12.5% of revenues. Id. at 145-46. Plaintiff again urged a return to a system of sharing revenues on the basis of actual usage. Id. at 73, 77-78. The parties were unable to agree and no joint tickets were offered thereafter.
 
 
 5
 Plaintiff brought suit against defendant under Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15. Plaintiff alleged that defendant violated Secs. 1 and 2 of the Sherman Act, 15 U.S.C. Sec. 1 and 2, by monopolizing, attempting to monopolize, and conspiring to monopolize the sale of downhill skiing services in Aspen, and by conspiring to restrain trade.
 
 
 6
 After the close of the evidence at trial, the district court granted defendant's motion for a directed verdict with respect to all of plaintiff's claims except the claims of unlawful monopolization and conspiracy to restrain trade between defendant and nonparties.
 
 
 7
 The jury found for plaintiff on the monopolization claim and for defendant on the conspiracy claim. II App. 603; I App. 31-32. The jury by special interrogatories found that the relevant product market was downhill skiing at destination ski resorts and that the relevant product submarket was downhill skiing services in the Aspen area, including multi-area and multi-day lift tickets. The jury also found that the relevant geographic market was North America and that the relevant geographic submarket was the Aspen area. I App. 30-31, II App. 601-02. The jury found that plaintiff had suffered $2.5 million in damages by defendant's unlawful monopolization. I R. 33, II App. 603.[2]
 
 
 8
 The district court thereupon trebled the verdict and entered judgment of $7.5 million plus attorneys' fees and costs. I App. 35, II App. 607. The court also issued an injunction requiring defendant to participate with plaintiff in offering a joint four-area six-day ski-lift ticket for a period not exceeding three years. I App. 36-40. The district court denied motions for judgment notwithstanding the verdict, for a new trial, and for remittitur filed by defendant both after trial and seven months later. I R. 294, 296. The district court issued an order fixing the amount of costs and attorney's fees. Id. at 244. Defendant appeals, and plaintiff cross-appeals.[3]
 
 
 9
 * The relevant market
 
 
 10
 On appeal, defendant contends that the district court erred in instructing the jury on the relevant market. The trial court's instructions on the market and submarket are reproduced in the Appendix to this opinion. Defendant argues that the instructions on the relevant product submarket and geographic submarket were inadequate, and that the court erred in instructing the jury that "[t]here can be both a relevant market and a relevant submarket." II App. 584-85. See Brief of Defendant-Appellant, Cross-Appellee, at 22-40. Plaintiff says that at trial, however, defendant did not object to the instructions on these grounds. Instead, defendant objected on the ground that the relevant market issue should be decided by the court as a matter of law and should not be submitted to the jury. II App. 580-81.
 
 
 11
 Rule 51 of the Federal Rules of Civil Procedure provides that "[n]o party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Fed.R.Civ.P. 51. The purpose of this rule is to "prevent a litigant from taking advantage of an error which could be rectified by the court if called to its attention by timely and specific objection." Corriz v. Naranjo, 667 F.2d 892, 896 (10th Cir.1981), cert. granted, 456 U.S. 971, 102 S.Ct. 2233, 72 L.Ed.2d 844, cert. dismissed, 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1983) (by stipulation); see also Moe v. Avions Marcel Dassault-Breguet Aviation, 727 F.2d 917, 924 (10th Cir.1984); Taylor v. Denver and Rio Grande Western Railroad Co., 438 F.2d 351, 353 (10th Cir.1971); 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2551 (1971).
 
 
 12
 Accordingly, Rule 51 requires counsel "to make abundantly clear to the trial court the objecting party's position." Rogers v. Northern Rio Arriba Electric Cooperative, Inc., 580 F.2d 1039, 1042 (10th Cir.1978); see also Palmer v. Hoffman, 318 U.S. 109, 119, 63 S.Ct. 477, 483, 87 L.Ed. 645 (1943) ("In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error."); Community National Life Insurance Co. v. Porter Square Savings & Loan Association, 406 F.2d 603, 606 (10th Cir.1969) (objection to instruction "not sufficient because it was not distinct in explaining the grounds for objection as required by Rule 51"); 9 C. Wright & A. Miller, supra, Sec. 2554, at 643 ("grounds must be stated with sufficient clarity"). We have indicated that the grounds stated in the objection must be obvious, plain, or unmistakable. Corriz, supra, 667 F.2d at 896 (objections on grounds that elements of cause of action were not proven as a matter of law and that there was no evidence to support submission of claim to jury "are shotgun objections which do not meet Rule 51's specificity requirement").
 
 
 13
 Defendant argues that it did object to the charge on relevant submarket and contends that it took action at trial to sufficiently apprise the district court of these grounds. Defendant points to (1) its objection at the conference on instructions, set out below, where it objected to any submission of the market question to the jury; (2) its proposed instruction on market definition, which did not include instructions relating to submarkets; and (3) the argument made both in its trial memorandum and in its motion for a directed verdict that the relevant market, as a matter of law, could not be limited to Aspen, "and, implicitly, that there can be only one relevant market." Reply Brief of Defendant-Appellant, Cross-Appellee, at 2-3 (earlier emphasis added, later emphasis in original).
 
 
 14
 We note that at the conference in the district judge's chambers, during which both sides made their objections to the trial court's proposed instructions, counsel for the defendant made only the following objection to the relevant market instruction:
 
 
 15
 Your Honor, Defendants would object to the instruction concerning relevant market contained on pages 16 through 18 of the instructions. While the defendants recognize that there is case authority supporting the submission of the relevant market--the relevant market question to the jury, we believe that on the record established in this case that the market definition of both the product market and the geographic market should be decided as a matter of law and should not be submitted to the jury.
 
 XIV R. 2290.[4]
 
 16
 A few pages later in the record of the conference on instructions, the judge said she would make one other comment concerning the defendant's request that the court rule as a matter of law on the question of the relevant market; that if she were to rule as a matter of law on the relevant market, she would rule that "the relevant market was Aspen and that the relevant product market was down-hill skiing services;" that after hearing defendant's witnesses she thought there was enough factual contest for the question to go to the jury; and that her not ruling as a matter of law was actually better for the defendant. XIV R. 2292. At that point defendant's counsel said: "Just so the record is clear, our argument is that you should rule as a matter of law in our favor on that issue." Id. at 2292 (emphasis added). We feel this part of the record shows the intent of the defendant's objection to the market instructions and that it was not an objection directed to the form of the market and submarket portion of the charge, but was rather that the issue was for the court alone to decide.
 
 
 17
 Further, as noted the defendant did argue for a directed verdict on the theory that the evidence showed a larger market than just this Aspen area. IX R. 1450. And defendant says that its proposed instructions 13 through 16 "excluded any instruction on submarkets." Reply Brief of Defendant-Appellant, Cross-Appellee, at 2. The proposed instructions on product and geographic market are general statements on the tests for the jury to follow, they state detailed tests on both product and geographic market, and make no reference to any submarkets. I Supp.R. 87-90.
 
 
 18
 We cannot agree that these statements and objections relied on stated "distinctly the matter to which [defendant] objects and the grounds of [its] objection," Fed.R.Civ.P. 51, so as to amount to a proper objection to the market and submarket formulation in the charge. We long have held that the offering of a proposed instruction does not preserve a challenge to the court's instructions under Rule 51, absent a specific objection. See, e.g., Western Transmission Corp. v. Colorado Mainline, Inc., 376 F.2d 470, 474 (10th Cir.1967); Justheim Petroleum Co. v. Hammond, 227 F.2d 629, 635 (10th Cir.1955); Jones v. Koma, 218 F.2d 530, 531-32 (10th Cir.1955); see also Johnson v. Houser, 704 F.2d 1049, 1051 (8th Cir.1983) ("The mere tender of an alternative instruction without objecting to some specific error in the trial court's charge or explaining why the proferred instruction better states the law does not preserve the error for appeal."). In the instant case, we cannot agree that defendant adequately apprised the district court of the grounds on which it now challenges the instructions given. As we stated in a similar context, "[t]he trial judge cannot be held to the standard of omniscience apparently envisioned by defendant[ ]." Corriz, supra, 667 F.2d at 896; cf. Sunkist v. Winckler & Smith Co., 370 U.S. 19, 26-27, 82 S.Ct. 1130, 1134-1135, 8 L.Ed.2d 305 (1962) (when counsel made objections at conference on instructions before charge was given and requested instructions on basis of objections, and after charge counsel was told all prior objections would be preserved, waiver did not occur in light of that assurance and prior objections and requests). We are persuaded that the record shows no proper and timely objection on the ground that the market and submarket part of the charge was erroneous.
 
 
 19
 Defendant says that if we do not agree that a proper objection was made on this ground, then we should consider the point as plain error that generated a miscarriage of justice. Reply Brief of Defendant-Appellant, Cross-Appellee, at 3-4. However, where an objection to an instruction is not made before the jury retires for deliberation, we only review an instruction that is "patently plainly erroneous and prejudicial." See Moe v. Avions Marcel Dassault-Breguet Aviation, 727 F.2d 917, 925 (10th Cir.1984); Fiedler v. McKea Corp., 605 F.2d 542, 548 n. 1 (10th Cir.1979). In a civil case only rarely will we review an error in the instructions when no specific objection was made. E.g., Glasscock v. Wilson Constructors, Inc., 627 F.2d 1065, 1067-68 (10th Cir.1980); Fabian v. E.W. Bliss Co., 582 F.2d 1257, 1260 (10th Cir.1978); 9 C. Wright & A. Miller, supra, Sec. 2558, at 672 ("[a]ctual reversals on basis of plain error are rare"). We have said that a new trial should be ordered in the absence of an objection below if an error in the instructions resulted in a "miscarriage of justice,"[5] and we review instructions to which proper objection was not made only if they are "patently plainly erroneous and prejudicial."[6]
 
 
 20
 We cannot say that the district court's instructions on the relevant market resulted in a "miscarriage of justice" or were "patently plainly erroneous and prejudicial." Courts repeatedly have cautioned that the plain error exception is limited to exceptional cases where the error "has seriously affected the fairness, integrity or public reputation of judicial proceedings." Rowe International, Inc. v. J-B Enterprises, Inc., 647 F.2d 830, 835 (8th Cir.1981); see also Morris v. Getscher, 708 F.2d 1306, 1309 (8th Cir.1983); Dunn v. Sears, Roebuck & Co., 639 F.2d 1171, 1176 (5th Cir.), modified on other grounds, 645 F.2d 511, 513 (5th Cir.1981); Whiting v. Jackson State University, 616 F.2d 116, 126 (5th Cir.1980); 9 C. Wright & A. Miller, supra, Sec. 2558, at 675 ("If there is to be a plain error exception to Rule 51 at all, it should be confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings."). The instructions here were not "hopelessly confusing"[7] and did not fail "to provide even the barest legal guideposts to aid the jury in rationally reaching a decision."[8] Accordingly, the plain error exception to Rule 51 should not be applied to upset the verdict here.
 
 
 21
 In sum, we hold that defendant's attack on the relevant market instruction is not premised on a proper objection and that the circumstances do not justify setting aside the verdict and judgment on grounds not raised below.
 
 II
 Monopolization
 
 22
 Defendant argues that "there was insufficient evidence to present a jury issue of monopolization because, as a matter of law, the conduct at issue was pro-competitive conduct that a monopolist could lawfully engage in." Brief of Defendant-Appellant, Cross-Appellee, at 40. Defendant essentially reasons that plaintiff articulated six ways in which defendant's conduct allegedly constituted monopolization, and that none of these created an issue for the jury because none were anti-competitive.
 
 
 23
 In closing argument, plaintiff's counsel argued that defendant used its power "to deliberately exclude [plaintiff] from a substantial portion of the destination skier visits beginning in the 1977- '78 season, by doing six things:" (1) forcing plaintiff out of the four-area ticket by requiring that revenues be divided below plaintiff's market share; (2) substituting defendant's three area ticket for a four area ticket; (3) marketing and advertising its three mountains in a manner designed to convince consumers that Aspen had only three mountains, not mentioning Aspen Highlands; (4) making an agreement with a tour operator to sell defendant's tickets to the exclusion of plaintiffs; (5) refusing to accept plaintiff's coupons during the 1978-79 season; and (6) raising ticket prices for a single-day lift ticket thus eliminating plaintiff's ability to offer a multi-area ticket.[9]
 
 A. Waiver
 
 24
 In response to defendant's attack on plaintiff's six theories, plaintiff contends that defendant's argument "is largely a legal one," and because defendant failed to object to the instruction on monopolization, it is the law of the case. The thrust of plaintiff's argument is that defendant has waived its opportunity to challenge the sufficiency of the evidence under legal principles different from those announced in the instructions.
 
 
 25
 Defendant challenges the first, second, fifth and sixth theories reasoning that their validity hinges on whether defendant had a duty to cooperate with plaintiff, and that as a matter of law no such duty could have existed. See Brief of Defendant-Appellant, Cross-Appellee, at 42, 47, 56, 58. We agree that the validity of the above four theories is premised on the theory of a duty to cooperate. And we agree that defendant has preserved the right to challenge the sufficiency of the evidence of this theory to support the verdict.
 
 
 26
 Defendant moved for a directed verdict on two occasions. Each time it urged that there was no duty to cooperate. II App. 427-29; id. at 561-63 (renewed motion for directed verdict incorporating arguments made at close of plaintiff's case). This preserved defendant's opportunity to challenge the sufficiency of the evidence on that issue under the truly controlling law, regardless of defendant's failure to object to the jury instructions concerning a duty to cooperate. The Fifth, Seventh and Eighth Circuits have held that "[a] proper motion for a directed verdict and its denial will always preserve for review the question whether under the law truly applicable to the case there was an adequate evidentiary basis for the submission of the case to the jury." Coca-Cola Bottling Co. v. Hubbard, 203 F.2d 859, 862 (8th Cir.1953) (emphasis added); see also Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc., 619 F.2d 660, 662-63 (7th Cir.) (en banc), cert. denied, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980); Mid-America Food Service v. Ara Services, Inc., 578 F.2d 691, 696 n. 4 (8th Cir.1978); House of Koscot Development Corp. v. American Line Cosmetics, Inc., 468 F.2d 64, 65-66 (5th Cir.1972); Johnson v. United States, 434 F.2d 340, 343 (8th Cir.1970); Gorsalitz v. Olin Mathieson Chemical Corp., 429 F.2d 1033, 1040 n. 5 (5th Cir.1970); Hanson v. Ford Motor Co., 278 F.2d 586, 593 (8th Cir.1960). Thus, "in determining whether a trial court has erred in denying a motion for a directed verdict ..., it is the applicable law that is controlling, and not what the trial court announces the law to be in his [or her] instructions." Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc., 619 F.2d 660, 663 (7th Cir.) (en banc) (quoting Coca-Cola Bottling v. Hubbard, supra, 203 F.2d at 862), cert. denied, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980). Therefore we will consider the validity of the theory that defendant had a duty to cooperate or deal with plaintiff in these circumstances.
 
 B. Duty to cooperate or duty to deal
 
 27
 We must decide whether under the truly applicable law there was sufficient evidence for the jury to conclude that defendant's refusal to market a four-mountain ticket, together with defendant's other conduct, constituted monopolization in violation of Sec. 2 as a refusal to cooperate, sometimes referred to as a refusal to deal.[10] Defendant replies that this case is not one where any such duty exists, arguing that such a duty can arise only in different circumstances where, through vertical integration, one firm has come to monopolize or control the supply of a component necessary for production, distribution or sale of a rival's product or service.[11] Brief of Defendant-Appellant, Cross-Appellee, at 44 n. 32; Reply Brief of Defendant-Appellant, Cross-Appellee, at 13-14.
 
 
 28
 The instances in which a monopolist has a duty to cooperate or deal is one of the most "unsettled and vexatious" issues in antitrust law. Byars v. Bluff City News Co., Inc., 609 F.2d 843, 846 (6th Cir.1980). "There exist two conceptually similar lines of cases which impose a duty to deal upon a monopolist." Id. at 855; see also MCI Communications v. AT & T, 708 F.2d 1081, 1148 (7th Cir.) cert. denied, --- U.S. ----, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).[12] First, there is the so-called essential facilities or bottleneck doctrine. "Under this approach, a business or group of businesses which controls a scarce facility has an obligation to give competitors reasonable access to it." Byars, supra, 609 F.2d at 856 & n. 34 (citing Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed.2d 2013 (1945) (Associated Press enjoined from continuing its practice of refusing to furnish its service to its members' competitors); United States v. Terminal Railroad Association, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (railroad companies jointly owning a terminal facility that was only feasible facility when coming to city from west must make facility available to non-proprietor railroads on non-discriminatory reasonable terms); Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 194 F.2d 484 (1st Cir.) (fruit wholesalers who jointly own a warehouse may not exclude competing wholesaler, absent some justification), cert. denied, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952).
 
 
 29
 Second, in various contexts courts have employed an intent test under which a "business is free to deal with whomever it pleases so long as it has no 'purpose to create or maintain a monopoly.' " Byars, supra, 609 F.2d at 855 (quoting United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)); see also MCI, supra, 708 F.2d at 1148. "These cases focus on the intent and competitive effect of the refusal to deal; not on whether the facility itself is 'essential.' " MCI, supra, 708 F.2d at 1148 (citing Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) (newspaper publisher enjoined from refusing to accept advertisements from customers who advertised with competing radio station); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) (permissible for jury to infer that defendant's refusal to sell to plaintiffs was in pursuance of purpose to monopolize); United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) (absent any purpose to create or maintain monopoly, Sherman Act does not restrict manufacturer's right to refuse to deal)).
 
 
 30
 We recognize that the cases do not fit neatly into these two categories. There is a significant amount of overlap between them.[13] Nevertheless the dichotomy, though in part illusory, is a useful analytical tool.[14] On this record we conclude that both groups of cases apply and support the judgment here.[15]
 
 
 31
 (1). Essential facilities (or bottleneck)
 
 
 32
 The essential facilities or bottleneck doctrine has been applied in a variety of circumstances. In Terminal Railroad, the defendant railroads jointly owned the only feasible terminal for rail traffic coming to St. Louis from the west. The Court decreed that in the special circumstances of the terminal and bridge facilities, the railroad companies and terminal company should provide reasonable access to the facility for competing railroads. Terminal Railroad, supra, 224 U.S. at 411, 32 S.Ct. at 516. In MCI Communications v. AT & T, supra, 708 F.2d at 1133, the doctrine was applied where the competing defendant system controlled access to the communications facility essential to operation of its competitor. The Seventh Circuit identified four elements necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability to duplicate the facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. MCI, supra, 708 F.2d at 1132-33. Evidence was presented on these factors here.
 
 
 33
 First, there is no dispute that defendant controlled three of the four skiing mountains in the Aspen area. If defendant refuses to market a multi-day multi-mountain ticket with plaintiff, plaintiff cannot compete in the market for such tickets. Yet, defendant through its control of three of the four mountains can continue to offer such a ticket. We believe this is sufficiently analogous to Terminal Railroad to satisfy the element of control of an essential facility. Second, there was evidence concerning the difficulty of developing another ski area in Aspen due to regulatory restrictions, and delays, and the expense and time required to develop new mountains. E.g., IV R. 377-79; VI R. 790-91; XII R. 2079-82. Third, there is no dispute that defendant denied the use of the "facility" to plaintiff. Defendant admits that it refused to continue to market a joint ticket with plaintiff. See Brief of Defendant-Appellant, Cross-Appellee, at 42-48. Fourth, there was evidence that it was feasible for defendant to provide access to the "facility." Prior to this litigation, plaintiff and defendant had marketed a joint multi-day multi-mountain ticket. There was testimony that defendant refused to accept coupons from plaintiff's Adventure Pack, although the coupons were at least as convenient as checks and credit cards. III R. 330-31.
 
 
 34
 We are not convinced by defendant's arguments based on its restrictive analysis that this is not a case of a vertical integration bottleneck. The substance of an essential facilities case was made. We must remember that this issue is raised by a claim of error in the denial of defendant's motion for a directed verdict and for judgment n.o.v. In that connection we must view the evidence most favorably to the party against whom the motion is made, and give that party the benefit of all reasonable inferences. See, e.g., Hurd v. American Hoist and Derrick Co., 734 F.2d 495, 498 (10th Cir.1984); Yazzie v. Sullivent, 561 F.2d 183, 188 (10th Cir.1977). We hold that in these circumstances there was sufficient proof to sustain the verdict on the basis of a duty to deal or cooperate, and wrongful refusal to deal.
 
 
 35
 (2). Intent
 
 
 36
 We likewise feel there was sufficient evidence for a finding against defendant on the basis that defendant's intent in refusing to market a multi-day multi-mountain ticket with plaintiff was to "create or maintain a monopoly." Colgate, supra, 250 U.S. at 307, 39 S.Ct. at 468.[16] By refusing to cooperate with plaintiff, defendant became the only business in Aspen that could offer a multi-day multi-mountain skiing experience. This is an important factor to attract Aspen skiers who seek variety. I App. 191, 243. There was evidence that defendant refused to offer a four mountain ticket, despite skiers' frustration over its unavailability. II App. 525-33.
 
 
 37
 To compete with defendant's three-mountain ticket, plaintiff developed an "Adventure Pack." This was a six day ticket designed to permit skiers to ski three of the six days at defendant's mountains. To do this, plaintiff included vouchers in the packet that theoretically were negotiable at defendant's ticket windows. Although there was evidence that these vouchers were guaranteed by a bank, and easier to accept than checks or charge cards, defendant refused to accept them. III R. 328-35. After plaintiff modified its Adventure Pack to eliminate any of defendant's objections, IV R. 504-05, defendant raised the price of its single-day ticket to $22.00, thereby making it unprofitable for plaintiff to market its Adventure Pack. IV R. 534-35; IX R. 1424-25.
 
 
 38
 We hold that there was sufficient evidence for the jury to conclude that defendant's refusal to market a four-mountain ticket,[17] considered together with its other conduct, showed its intent to create or maintain a monopoly and thus a violation of Sec. 2.[18]
 
 III
 Injury
 
 39
 Defendant argues that even assuming that it abused its monopoly power, plaintiff cannot recover because it has failed to establish that defendant's unlawful conduct caused plaintiff injury in its business or property. Such injury is an essential element that plaintiff must prove to recover under the antitrust laws. E.g., Central National Bank v. Rainbolt, 720 F.2d 1183, 1187 (10th Cir.1983); Mountain View Pharmacy v. Abbott Laboratories, 630 F.2d 1383, 1389 (10th Cir.1980); World of Sleep, Inc. v. Stearns & Foster Co., 525 F.2d 40, 43-44 (10th Cir.1975). Plaintiff's damage evidence covered four skiing seasons--1977-78 through 1980-81--and included expert testimony on such damages with estimates ranging from $3,162,100 to $4,708,600. See, e.g., Plaintiff's Exhibit 101.
 
 
 40
 Defendant reasons that plaintiff sought to show that its business would have been more profitable if defendant had agreed to market a four-mountain ticket and had not marketed its own three-mountain ticket; that the only evidence that plaintiff relied on to show this was that of its expert, Mr. Farwell; and that this testimony should have been excluded because it was grounded on two false assumptions. See Brief of Defendant-Appellant, Cross-Appellee, at 60-62; Reply Brief of Defendant-Appellant, Cross-Appellee, at 15-16. We reject defendant's argument for two independent reasons.
 
 
 41
 First, there was sufficient evidence of injury, other than Farwell's testimony, to sustain the jury verdict. For example, plaintiff's president and owner, II R. 149, testified that plaintiff was "severly damaged" by defendant's refusal to market a four-mountain ticket. III R. 197; see also id. at 195. Plaintiff's financial vice president, IX R. 1374, testified that elimination of the four-mountain ticket had the effect of a loss of revenues during the 1978-79, 1979-80, and 1980-81 skiing seasons; he made projections assuming that plaintiff's "slice of the pie" would stay the same and made a rough estimation of a 50-60% loss attributable to the marketing practices of defendant. IX R. 1386-91, 95. He also testified that as a result of eliminating the four-mountain ticket, plaintiff became "a day ski area in a destination market." IX R. 1425. Moreover, there was testimony that because of the elimination of the four-mountain ticket plaintiff had to decrease the number of its ski patrolmen. IV R. 477. There was sufficient evidence for the jury to conclude that plaintiff proved that it was injured by defendant's unlawful conduct.
 
 
 42
 Second, we reject defendant's argument that the testimony and exhibits of plaintiff's expert[19] were grounded on two false assumptions, and therefore were inadmissible. Defendant says that the validity of the expert testimony "depended explicitly on two indispensable assumptions: (1) that [plaintiff's] ski areas and those of [defendant] 'are equally desirable in the mind of the consumer;' and, (2) that [defendant] would not offer its own 3-area 6-day ticket during the damage period to attract customers away from the jointly-offered 4-area ticket." Brief of Defendant-Appellant, Cross-Appellee, at 62 (citations omitted) (footnote omitted).
 
 
 43
 Although Farwell's assumptions may have been open to question, they were not so unsupported that the trial court abused its discretion in permitting admission of the testimony and exhibits. We begin with the general rule that we review a district court's admission or exclusion of expert testimony for abuse of discretion only. E.g., Scholz Homes, Inc. v. Wallace, 590 F.2d 860, 863 (10th Cir.1979) ("Trial courts have broad discretion in determining the extent to which expert testimony is admissible."); see also Garwood v. International Paper Co., 666 F.2d 217, 223 (5th Cir.1982) ("the district court's admission or exclusion of expert testimony under Fed.R.Evid. 702 is reviewable only for abuse of discretion").
 
 
 44
 We cannot say that the admission of this expert testimony was an abuse of discretion. Although there may have been considerable evidence contradicting the expert's assumptions, his assumptions were not without support.[20] See also Litton Systems, Inc. v. AT & T, 700 F.2d 785, 822-25 (2d Cir.1983) (expert's damage projections admissible because assumptions on which they were based were supported in record), cert. denied, --- U.S. ----, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). Moreover, "the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness [is] squarely on the shoulders of opposing counsel's cross-examination." Smith v. Ford Motor Co., 626 F.2d 784, 793 (10th Cir.1980) (emphasis added), cert. denied, 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981).[21] We therefore conclude that permitting the jury to consider the testimony from plaintiff's expert was not an abuse of discretion.[22]
 
 
 45
 Defendant also argues that plaintiff failed to show that it was injured by reason of an antitrust violation for the 1977-78 ski season. Defendant contends that a four-mountain ticket was offered in 1977-78 and therefore any injury suffered by plaintiff during this season was based on defendant's lawful offering of its own three-area ticket. Brief of Defendant-Appellant, Cross-Appellee, at 76-78; Reply Brief of Defendant-Appellant, Cross-Appellee, at 19-21.
 
 
 46
 This argument ignores the evidence before the jury of antitrust injury suffered by plaintiff in having to accept 15% as its share of net revenues from the sale of four-area tickets during 1977-78. Plaintiff's counsel contended in closing argument that defendant had used its market "power to deliberately exclude [plaintiff] from a substantial portion of the destination skier visits beginning in the 1977- '78 season by [, among other things,] [i]mposing a condition that revenue must be divided on the four-area ticket based upon a fixed percentage substantially below [plaintiff's] market share previously realized, and to do so, to force [plaintiff] out of the four-area ticket." II App. 574.
 
 
 47
 In years preceding 1977-78, revenues from the sale of the joint four-area tickets were divided on the basis of actual use. In all but one of these seasons, plaintiff received between 16.8% and 18.5% of the revenues based on actual use of its facility. Only during 1976-77, a season that plaintiff contended was marked by below average amounts of snowfall and an unusually low number of skiers visiting the Aspen area, did plaintiff's share of the revenues based on actual use fall below 16.8%. Its share during this season was 13.2%. Defendant offered to continue the joint ticket for 1977-78 if plaintiff would accept a 13.2% fixed percentage of the revenues. III R. 270-71. Plaintiff objected to this percentage because it was based on the survey for 1976-77. Id. at 271. Plaintiff's vice president testified that "it looked pretty obvious to us that [defendant] had no intention of really having a four-area, six-day ticket with us, and we felt that our own [sic] chance of keeping this thing alive was to accept some type of a fixed percentage, because [defendant was not] going to go along with a survey [of actual use]." Id. at 273. As a result, plaintiff offered a "compromise" deal in which it would accept the average of its previous three years as its share of the revenue for 1977-78. Id. The parties eventually settled on 15% as plaintiff's share of the revenues for the 1977-78 season.
 
 
 48
 We conclude that there was sufficient evidence for the jury to conclude that plaintiff was injured through the exercise of monopoly power by defendant's acts in compelling plaintiff to accept 15% as its share of the profits from the joint four-area ticket during the 1977-78 season, rather than dividing revenues on the basis of actual use. And of course, with respect to the 1978-79, 1979-80, and 1980-81 years defendant did refuse to deal with plaintiff in the marketing of a four-mountain ticket, in addition to its other acts.
 
 
 49
 The expert testimony thus supported the jury inference of injury in fact resulting from defendant's violation of Sec. 2, and the testimony of other witnesses as well. In sum, the requirement of proof of injury as an element of plaintiff's case was met. King & King Enterprises v. Champlin Petroleum Co., 657 F.2d 1147, 1156, 1160 (10th Cir.1981), cert. denied, 454 U.S. 1064, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).
 
 IV
 Damages
 
 50
 Lastly, defendant takes issue with the proof supporting the jury's award of $2.5 million in damages, which the district court trebled to $7.5 million. Defendant again challenges the testimony and exhibits of plaintiff's expert Farwell. Defendant contends that Farwell's damage estimates of $4,708,600 under his "Method A" and $3,162,100 under "Method B" are an inadequate foundation for the jury's damage award. Farwell's "Method A" estimate of damages was based on the assumption of a trend of the market share continuing in favor of plaintiff through the damage years projected. Farwell estimated the before tax profit that would have been produced if the defendant's marketing practices had not changed; this method produced the $4,708,600 estimate of damages. Farwell's "Method B" was more conservative and assumed that the plaintiff would only continue to have the average market share of recent prior years through the damage years projected; this method produced the $3,162,100 estimate of loss resulting from defendant's change in marketing practices.
 
 
 51
 The Supreme Court has recognized that an antitrust plaintiff is rarely able to prove its damages with mathematical precision. See, e.g., J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981) ("The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of defendant's antitrust violation."); Zenith Corp. v. Hazeltine, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969) ("damages issue in [cases where plaintiff was partially or totally excluded from a market] are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts"); see also King & King Enterprises v. Champlin Petroleum Co., 657 F.2d 1147, 1158 (10th Cir.1981), cert. denied, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); Cackling Acres, Inc. v. Olson Farms, Inc., 541 F.2d 242, 246 (10th Cir.1976), cert. denied, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). The Court has emphasized that the trier of fact can determine the amount of damages from "a just and reasonable estimate of the damage based on relevant data." Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). The damage award, however, may not be based on "speculation or conjecture." Id.
 
 
 52
 In Part IV, supra, we rejected defendant's challenge to the testimony and exhibits of plaintiff's expert Farwell in the context of proving injury. We similarly must reject defendant's argument concerning the inadequacy of the proof concerning damages, particularly in light of the general rule that "the burden of proving the amount of damages is less than that required for proving the fact of damage." ABA Antitrust Section, Antitrust Law Developments 409 (2d ed. 1984); see also Story Parchment Co. v. Patterson Parchment Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). As we stated in a similar context:
 
 
 53
 If the calculations upon which the loss of profits are based are estimated in any reasonable way and the underlying assumptions on which the [expert] relied are not without support in the record, the calculations may be upheld as a valid means of measuring loss of profits.
 
 
 54
 King & King Enterprises, supra, 657 F.2d at 1158. (emphasis added). In light of Farwell's testimony and exhibits, we cannot say that the jury's $2.5 million damage award was based on "speculation or conjecture." See id. at 1162-63 ("The weight and probative value of [experts'] testimony was for the jury to decide.... 'Even though we may not agree with each step in the [fact finder's] reasoning process, we must affirm ... unless the findings are beyond the pale of sane judgment.' " (quoting Trabert & Hoeffer, Inc. v. Piaget Watch Corp., 633 F.2d 477, 484 (7th Cir.1980)); see also Midwest Underground Storage v. Porter, 717 F.2d 493, 501 (10th Cir.1983) (upholding jury damages award that was "within the range of the evidence," even though exact amount of award was open to question).
 
 
 55
 Defendant also argues that the $2.5 million damage award is excessive. The district court rejected defendant's motion for a new trial based, in part, on the claim that the damage award was "grossly excessive." I R. 212; I App. xviii. We must afford the district court's refusal to grant a new trial on the excessive damages claim "considerable deference on appeal." Blevins v. Cessna Air Craft Co., 728 F.2d 1576, 1579 (10th Cir.1984); see also Midwest Underground Storage Inc., 717 F.2d at 502 ("The decision whether to grant a new trial is committed to the informed discretion of the district court, which is generally in a better position to evaluate claims of jury confusion or other error in the verdict."). "Moreover, 'absent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate.' " Blevins, supra, 728 F.2d at 1579 (quoting Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1168 (10th Cir.1981) (en banc) (plurality opinion), cert. denied, --- U.S. ----, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983)); see also Hurd v. American Hoist and Derrick Co., 734 F.2d 495, 503 (10th Cir.1984).
 
 
 56
 We cannot say that the district court abused its discretion in denying defendant's motion for a new trial on the basis of the alleged excessiveness of the verdict or that the $2.5 million award is so excessive as to shock the judicial conscience. Indeed, the jury's award was below the estimates of plaintiff's expert Farwell, whose testimony we held to be admissible in supra Part III.[23] Defendant's other challenges to certain aspects of the exhibits on which Farwell relied, see Brief of Defendant-Appellant, Cross-Appellee, at 79-80, do not convince us that overturning the jury's damage award is appropriate here.
 
 V
 Attorneys' fees and costs on appeal
 
 57
 Plaintiff asks that we award it "costs, including reasonable attorneys' fees, on appeal." Reply and Answer Brief of Plaintiff-Appellee, Cross-Appellant, at 84. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws ... shall recover ... the cost of suit, including a reasonable attorney's fee." 15 U.S.C. Sec. 15(a).
 
 
 58
 In Perkins v. Standard Oil Co., 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1970), the Supreme Court held that Sec. 4 of the Clayton Act "authorize[s] the award of counsel fees for legal services performed at the appellate stages of a successfully prosecuted private antitrust action." Id. at 223, 90 S.Ct. at 1990; see also Alexander v. National Farmers Organization, 696 F.2d 1210, 1211-12 (8th Cir.1982), cert. denied, --- U.S. ----, ----, 103 S.Ct. 2108, 2110, 77 L.Ed.2d 313 (1983); Moore v. Jas. H. Matthews & Co., 682 F.2d 830, 839 & n. 11 (9th Cir.1982); Carpa, Inc. v. Ward Foods, Inc., 536 F.2d 39, 55-56 (5th Cir.1976); see generally 2 S. Speiser, Attorneys' Fees Sec. 14:6 (1973). The Supreme Court in Perkins indicated that "[t]he amount of the award for such services should, as a general rule, be fixed in the first instance by the District Court, after hearing evidence as to the extent and nature of the services rendered." 399 U.S. at 223.
 
 
 59
 Accordingly we remand to the district court to hold a hearing on the appropriate amount of attorneys' fees and costs incurred by plaintiff which are attributable to the appeal in No. 82-1407. With respect to the cross-appeal in No. 82-1424, the issues raised were only to be considered if defendant Aspen Skiing Company was successful in its appeal. See note 3, supra. In view of these circumstances, we conclude that each side should bear its own appellate costs and attorneys' fees which are attributable to the cross-appeal. On remand the district court should thus determine the appellate costs and attorneys' fees attributable to the appeal in No. 82-1407 and award those costs and attorney's fees to plaintiff.
 
 VI
 Conclusion
 
 60
 We are satisfied that the trial was fairly conducted, that the instructions were balanced and fair to both sides, and that no error is demonstrated. Accordingly in all respects the judgment of the district court is affirmed, and the case is remanded to the district court for further proceedings concerning appellate attorney's fees and costs as provided in Part V.
 
 APPENDIX
 
 61
 The district court's relevant market instruction was as follows:
 
 
 62
 A relevant market has two components: One is the product market and the other is the geographic market.
 
 
 63
 Product market: The parties are in disagreement as to what the relevant product market is. Aspen Highlands claims that downhill skiing services in Aspen, including multi-area, multi-day lift tickets is the relevant product market. Aspen Skiing Corporation and its subsidiaries claim that the relevant product market is downhill skiing at destination ski resorts.
 
 
 64
 Like many issues of fact, this one calls upon you to apply your collective common sense and experience to the record of evidence before you.
 
 
 65
 The basic idea of a relevant product market is that the product or services within it can be substituted for each other as a practical matter from the buyer's point of view. Two products need not be identical to be in the same market, but they must be as a matter of practical fact in the actual behavior of consumers substantially or reasonably interchangeable to fill the same consumer needs or purposes. Two products are within a single market if one item could suit buyers' needs substantially as well as the other.
 
 
 66
 One way you can tell whether products are reasonable substitutes for each other is to consider whether changes in the price of one have fairly direct and substantial effects upon the sales of the other. If so, the products are probably in the same market. You can also consider how people in the industry and the public at large view the products, whether the products have similar prices, whether the products are sold to similar customers, and whether they are sold by the same kind of sellers. Other factors which you should consider include the special characteristics and uses of each product and the overlap between the consumers of different products.
 
 
 67
 In sum, you are being asked to decide which products compete with each other. No one factor is necessarily decisive; but the more of these criteria that are present, the more likely the particular market is a separate product or service market.
 
 
 68
 Sub-markets: Once you have determined the relevant product market, you next have to consider whether or not there exists within that product market a relevant sub-market. Even though a group of products are sufficiently interchangeable to be grouped in one product market, there may be within that group a smaller group of products that compete so directly with each other as to constitute a sub-market with in [sic] the larger market; or the products or services of a particular seller may have such particular characteristics and such particular consumer appeal and are sufficiently insensitive to price variations of other products that they constitute a relevant sub-market all by themselves.
 
 
 69
 There can be both a relevant market and a relevant sub-market or just a relevant market without any relevant sub-market. Thus, if you decide that the relevant product market is downhill skiing at destination ski resorts, you must still determine whether downhill skiing services in Aspen, including multi-area, multi-day lift tickets is a sub-market within the larger market.
 
 
 70
 Relevant geographic market: Second, you must determine [the] relevant geographic market. The relevant geographic market is the area or areas in which these parties and their competitors compete for the sale of products that form the relevant product market. It is the area or areas to which a potential customer may rationally turn for the service or product he needs.
 
 
 71
 Just as there can be a sub-market within a relevant product market, there can be a sub-market within a relevant geographic market. Your destination [sic] of the geographic market or sub-market must both correspond to the commercial realities of the ski industry and be economically significant. Thus, although the geographic market in some instances may be national or international, under other circumstances it may be as small as a single town or resort area.
 
 
 72
 In this case, Aspen Highlands contends that the relevant geographic market is the Aspen area, while Aspen Skiing Corporation and its subsidiaries contend that it is North America. Thus, if you decide that the relevant product market is downhill skiing at destination ski resorts and the relative georgraphic [sic] market North America, you may still consider whether downhill skiing services in Aspen, including multi-area, multi-day lift tickets from a relevant product sub-market, and if so, whether the Aspen area is a relevant geographic sub-market.
 
 
 73
 XIV R. 2305-08.
 
 
 
 [1]
 Citations to "App." refer to the joint appendix on appeal prepared by the parties. Citations to "R." refer to the original record
 
 
 [2]
 On December 22, 1975, the Attorney General of Colorado brought an antitrust suit under federal law against both plaintiff and defendant challenging, among other things, the joint ticket offered by the parties. Exhibit X, III App. The suit was settled by entry of a consent decree on August 19, 1977, which permitted the continued marketing of the joint ticket for a period of five years subject to certain restrictions. Exhibit 26, III App
 Defendant argued that apprehension over continued scrutiny by the Attorney General of Colorado under the consent decree was one of the factors which led it to discontinue the joint ticket after plaintiff refused to accept 12.5% as its share of revenues. I App. 121. On appeal, defendant's position is that "even if it abandoned the joint ticket as a conscious and unequivocal refusal to cooperate with [plaintiff] in the marketing of their respective facilities, it committed no antitrust violation." Brief of Defendant-Appellant, Cross-Appellee, at 7-8.
 
 
 [3]
 Plaintiff does not seek a new trial. It asserts that the issues raised in its cross-appeal are "pertinent only if defendants are successful on their appeal." Opening Brief of Plaintiff-Appellee, Cross-Appellant, at 1. Because we affirm the trial court's judgment, we need not reach the arguments plaintiff advances in its cross-appeal
 
 
 [4]
 The determination of the relevant market is generally a question of fact. See Telex Corp. v. IBM, 510 F.2d 894, 915 (10th Cir.) (per curiam), cert. dismissed, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); see also Borough of Lansdale v. Philadelphia Electric Co., 692 F.2d 307, 311 (3d Cir.1982); Pinder v. Hudgins Fish Co., 570 F.2d 1209, 1220-21 (5th Cir.1978); Sulmeyer v. Coca Cola Co., 515 F.2d 835, 839 (5th Cir.1975), cert. denied, 424 U.S. 934, 98 S.Ct. 1148, 47 L.Ed.2d 341 (1976); ABA Antitrust Section, Antitrust Law Developments 110-11 (2d ed. 1984). On that fact question, the defendant raises no issue in this appeal. Defendant concedes that "the evidence supporting the jury's findings on market definition is irrelevant because this appeal does not present any issue as to the sufficiency of that evidence." Reply Brief of Defendant-Appellant, Cross-Appellee, at 7 n. 3 (citation omitted)
 
 
 [5]
 See Brown v. McGraw-Edison Co., 736 F.2d 609, 614 n. 6 (10th Cir.1984); Fox v. Ford Motor Co., 575 F.2d 774, 786 (10th Cir.1978)
 
 
 [6]
 Brown v. McGraw-Edison Co., 736 F.2d 609, 614 n. 6 (10th Cir.1984); Moe v. Avions Marcel Dassault-Breguet Aviation, 727 F.2d 917, 924 (10th Cir.1984); cf. Scholz Homes, Inc. v. Wallace, 590 F.2d 860, 864 (10th Cir.1979) ("plain and fundamental error")
 We have also said that an error in an instruction to which there was no objection may be plain error if it was a "generating factor which culminated in a verdict not warranted under the law." Herndon v. Seven Bar Flying Service, Inc., 716 F.2d 1322, 1330 (10th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984); see also Fox v. Ford Motor Co., 575 F.2d 774, 786 (10th Cir.1978); Pridgin v. Wilkinson, 296 F.2d 74, 76 (10th Cir.1961). We understand this to be merely a component of the inquiry whether the instruction was "patently plainly erroneous and prejudicial," or to have caused a "miscarriage of justice."
 
 
 [7]
 Frederic P. Wiedersum Associates v. National Homes Construction Corp., 540 F.2d 62, 66 (2d Cir.1976)
 
 
 [8]
 McNello v. John B. Kelley, Inc., 283 F.2d 96, 102 (3d Cir.1960) (quoted in Frederic P. Wiedersum Associates, supra, 540 F.2d at 66); see also Morris v. Getscher, 708 F.2d 1306, 1309-10 (8th Cir.1983) (instruction constituted plain error when it "provided the jury with virtually no guidance" and "essentially allowed the jury to arrive at a verdict through speculation or conjecture"); Cruthirds v. RCI, Inc., 624 F.2d 632, 636 (5th Cir.1980) (instruction that left "jury to speculate as to an essential point of law" was plain error)
 
 
 [9]
 In its brief, defendant quotes the following passage from plaintiff's closing argument:
 The evidence has also shown that the Aspen Skiing Corporation, Buttermilk Skiing Corporation, and Snowmass Skiing Corporation together used that power to deliberately exclude Highlands from a substantial portion of the destination skier visits beginning in the 1977-'78 season by doing six things: (1) Imposing a condition that revenue must be divided on the four-area ticket based upon a fixed percentage substantially below the Aspen Highlands' market share previously realized, and to do so, to force Aspen Highlands out of the four area ticket; as part of that, substituting their own three-area, six-day ticket which was provided in place of the four-area ticket and also provided for revenues being divided on the basis of usage; (3) marketing and advertising the Aspen resort in such a manner as to convince the newcomer to Aspen that Aspen only had three mountains rather than four mountains; (4) entering into special agreements with ARI, Aspen Reservations, Inc., the tour operator, for the purpose of inducing ARI, to sell Aspen Skiing Corporation tickets to the exclusion of Aspen Highlands' tickets; (5) refusing to accept Aspen Highlands Adventure Pack coupons during the '78-'79 season, again making it more difficult for Aspen Highlands to compete in the Aspen market; and (6) using their power to raise the individual daily lift ticket price this last year to $22, to completely eliminate Aspen Highlands' ability to offer a multi-area ticket in the Aspen market.
 See Brief of Defendant-Appellant, Cross-Appellee, at 41; XIII R. 2214-15.
 
 
 [10]
 We are mindful that one of the damage years was 1977-78, and that a four-area ticket was offered in that year. We discuss the antitrust injury attributable to this year in infra Part III
 
 
 [11]
 Defendant relies on Areeda & Turner, who state that "[i]n general, the monopolist is under no duty to help his rivals enter, survive, or expand." 3 P. Areeda & D. Turner, Antitrust Law p 738m, at 286 (1978). Defendant says that while an exception must be made for bottleneck cases where through vertical integration a firm has come to monopolize or control a component essential for a rival's survival, the "so-called 'bottleneck' cases are inapplicable here, however, because there is no claim that [defendant] is vertically integrated, or that it is the sole supplier of some component without which [plaintiff] absolutely cannot bring its product (here, service) to the market." Brief of Defendant-Appellant, Cross-Appellee, at 44-45 n. 32. We reject defendant's argument
 We are not convinced that the essential touchstone of bottleneck cases is vertical integration. See, e.g., P. Areeda & D. Turner, Antitrust Law p 728b4, at 231 (1978) ("Of course, the integrated monopolist is subject to the same Sec. 2 constraints as the non-integrated monopolist. An integrated monopolist cannot engage in refusals to deal tending unreasonably to exclude actual or potential rivals from his monopoly market."); L. Sullivan, Handbook of the Law of Antitrust Sec. 48, at 131 (1977) ("As a matter of policy, to require the monopolist [with a natural advantage monopoly, but without a vertical link to the customer level] to treat all like firms in the same way--to have, one might say, a rational and relevant basis for any distinctions it may make--is to protect vertically related and adjacent markets from being distorted because of arbitrary decisions by the monopolist.").
 We decline to adopt a narrow rule that would immunize an unintegrated monopolist from antitrust liability for refusing a competitor access to an essential facility in these circumstances. Vertical integration is not essential to finding a violation of the antitrust laws for a refusal to deal under the intent test. See, e.g., Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). We believe that it is also apparent that no bright line can be drawn between the bottleneck and intent cases. See infra note 13. Given this, and the need for a fact sensitive inquiry in this area, e.g., Byars v. Bluff City News, Inc., 609 F.2d 843, 860 (6th Cir.1980) (courts should "carefully analyze[ ] the fact situation before them to see whether defendants' conduct was anti-competitive ... in a case where there is a unilateral refusal-to-deal by a monopolist."), we conclude in the circumstances of this case that the bottleneck doctrine is applicable.
 
 
 [12]
 There are two elements to the offense of monopolization under Sec. 2 of the Sherman Act. The first is "the possession of monopoly power in the relevant market." The second is "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell, Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); see also MCI Communications v. AT & T, 708 F.2d 1081, 1106 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 274 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Of course, the fact of injury and damages suffered by reason of a violation of the antitrust laws must also be shown for a private litigant to recover on a claim of monopolization. E.g., Central National Bank v. Rainbolt, 720 F.2d 1183, 1187 (10th Cir.1983). The essentials of these elements were covered by the trial court's instructions. XIV R. 2304
 Defendant's challenge to the sufficiency of the evidence assumes, arguendo, that Aspen is the relevant market and that defendant had monopoly power in that market. See Brief of Defendant-Appellant, Cross-Appellee, at 40. Reply Brief of Defendant-Appellant, Cross-Appellee, at 7 n. 3 (defendant's "appeal does not present any issue as to the sufficiency of [the] evidence" on "the jury's findings on market definition"). Thus, the first element under Grinnell necessary to establish a Sec. 2 violation is not at issue.
 
 
 [13]
 The overlap of the essential facilities doctrine and the intent test is "apparent upon examination of Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973)." Byars, supra, 609 F.2d at 857. In Otter Tail, the defendant was a vertically integrated power company. It had the capacity to produce power and transmit it over its own lines to municipalities, where it could sell the power at retail prices. When municipalities sought to replace the defendant at the retail level, defendant refused to sell power to the municipalities
 Relying on both the intent test and the bottleneck theory, the district court found that this refusal to deal violated the antitrust laws. United States v. Otter Tail Power Co., 331 F.Supp. 54, 61 (D.Minn.1971). The Supreme Court in its brief analysis did not distinguish between the two theories. Otter Tail, supra, 410 U.S. at 377-79, 93 S.Ct. at 1029-30; see also Byars, supra, 609 F.2d at 857. The Court held that the district court finding "that Otter Tail's refusal to sell at wholesale or to wheel were solely to prevent municipal power systems from eroding its monopolistic position" was supported. Otter Tail, supra, 410 U.S. at 378, 93 S.Ct. at 1030.
 For other cases discussing a duty to deal but not distinguishing between the essential facilities doctrine and the intent test, see, e.g., Home Placement Service v. Providence Journal Co., 682 F.2d 274, 281 (1st Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983); Mid-Texas Communications, Inc. v. AT & T, 615 F.2d 1372, 1387-88 & n. 12 (5th Cir.) ("While in theory there exist differences between the two approaches, in practice the theories are similar."), cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980).
 
 
 [14]
 Only general intent, not specific intent, is necessary to a finding of a Sec. 2 violation of monopolization. See Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); United States v. Griffith, 334 U.S. 100, 105-06, 68 S.Ct. 941, 944-45, 92 L.Ed. 1236 (1948). But see Byars v. Bluff City News Co., Inc., supra, 609 F.2d at 859. "While the completed offense of monopolization under Sec. 2 demands only a general intent to do the act, 'for no monopolist monopolizes unconscious of what he is doing,' a specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt now charged." Times-Picayune Co., supra, 345 U.S. at 626, 73 S.Ct. at 890
 
 
 [15]
 Defendant relies on Telex Corp. v. IBM, 510 F.2d 894, 926 (10th Cir.) (per curiam), cert. dismissed, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975), for the proposition that its marketing of a three-mountain ticket was one of the "ordinary marketing methods available to all in the market," and therefore could not violate Sec. 2 of the Sherman Act. Brief of Defendant-Appellant, Cross-Appellee, at 48
 We need not decide that it was or would be illegal to offer a three-mountain ticket in competition with the four-mountain ticket. We believe that all of the evidence should be examined together, and we do not consider defendant's marketing of a three-area ticket in isolation from its other conduct. See infra note 18.
 
 
 [16]
 Defendant argues that "[t]he verdict cannot be construed as based on a finding that [defendant's] refusal to cooperate was intended, or was motivated by a purpose or desire, to achieve or maintain monopoly power" because the trial court "instructed the jury that no such finding was necessary." Brief of Defendant-Appellant, Cross-Appellee, at 47 n. 34. We must reject defendant's argument
 There was no proper or timely objection to the formulation of the intent instruction, as required by Rule 51. Fed.R.Civ.P. 51. Moreover, the charge correctly stated that "[w]illfully as used in these instructions means acting knowingly and deliberately, but it does not mean that [defendant] must have specifically intended to achieve or maintain monopoly power." XIV R. 2310. Under Sec. 2 general intent is all that is required to support a monopolization claim; only for a mere attempt to monopolize is specific intent required to be shown. E.g., Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); United States v. Griffith, 334 U.S. 100, 105-06, 68 S.Ct. 941, 944-45, 92 L.Ed. 1236 (1948); Home Placement Service v. Providence Journal Co., 682 F.2d 274, 281 (1st Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983); see also Bank of Utah v. Commercial Security Bank, 369 F.2d 19, 26 (10th Cir.1966), cert. denied, 386 U.S. 1018, 87 S.Ct. 1374, 18 L.Ed.2d 456 (1967). But see Byars v. Bluff City News Co., 609 F.2d 843, 859 (6th Cir.1980). The trial judge was instructing the jury as to the elements of the offense of monopolization, not an attempt to monopolize, and she properly instructed that specific intent was not an element of that offense.
 
 
 [17]
 The trial judge's charge referred to the duty to cooperate with a business rival and said that a refusal to deal with a competitor "does not violate Section 2 if valid business reasons exist for that refusal." XIV R. 2311
 
 
 [18]
 Defendant argues that each of the "six things" on which plaintiff relied to demonstrate that it was deliberately excluded from the destination skier market must be supported by sufficient evidence to support a Sec. 2 verdict. See supra note 9. Defendant reasons that if we "uphold[ ] the legal sufficiency and proof of one or more, but not all, of [plaintiff's] theories, then [defendant] is entitled to a new trial." Brief of Defendant-Appellant, Cross-Appellee, at 59-60
 Defendant relies on Northeastern Telephone Co. v. AT & T, 651 F.2d 76 (2d Cir.1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) for the above proposition. In Northeastern, the Second Circuit reversed and held that plaintiff failed to prove five of the six types of conduct it alleged were anti-competitive. Because the interrogatories submitted to the jury did not permit the court to determine whether the jury based its damage award on any of the five types of conduct that plaintiff had failed to prove were anti-competitive, the Second Circuit remanded for a new trial. We cannot agree that each one of the "six things" which plaintiff argued demonstrated abuse of monopoly power, taken alone, must be supported by sufficient evidence to find a Sec. 2 violation. We reach this conclusion for two reasons.
 First, defendant's argument would require that we view each of the "six things" in isolation. To do this, however would be contrary to the Supreme Court's admonition that an antitrust plaintiff "should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962); see also Associated Press v. United States, supra, 326 U.S. at 14, 65 S.Ct. at 1416; Northeastern Telephone v. AT & T, supra, 651 F.2d at 95 n. 28 (recognizing rule in Continental Ore but distinguishing it where proof was "utterly lacking" in "numerous critical respects"); Case-Swayne Co. v. Sunkist Growers, Inc., 369 F.2d 449, 459 (9th Cir.1966), cert. denied, 387 U.S. 932, 87 S.Ct. 2056, 18 L.Ed.2d 994, rev'd on other grounds, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967); GVF Cannery, Inc. v. California Tomato Growers Association, Inc., 511 F.Supp. 711, 716 (N.D.Cal.1981). Plaintiff's evidence should be viewed as a whole. Each of the "six things" viewed in isolation need not be supported by sufficient evidence to amount to a Sec. 2 violation. It is enough that taken together they are sufficient to prove the monopolization claim.
 Second, defendant never objected to the instructions that required the jury to consider the evidence as a whole. XIV R. 2295 (jury instruction); XIV R. 2290-92 (defendant's objections to instructions). In fact, the trial judge instructed that the plaintiff is "not required to prove every one of its allegations about anti-competitive conduct. Once again, you have a problem for judgment, for thorough and sensitive weighing of the evidence." XIV R. 2213-14. Moreover, defendant did not submit more specific interrogatories that would have required the jury to make the grounds for its decision clear. I R. 143-45 (defendant's special interrogatories on monopolization). In these circumstances, we should uphold the general verdict if the proof on various theories is sufficient to sustain the general verdict. See e.g., Union Pacific Railroad Co. v. Lumbert, 401 F.2d 699, 701 (10th Cir.1968) (absent pertinent objection to charge or request for specific interrogatory, a general verdict is upheld where there is substantial evidence supporting any ground of recovery in favor of an appellee); see also Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc., 703 F.2d 1152, 1176-77 n. 20 (10th Cir.1981), (en banc) (plurality opinion) cert. denied, --- U.S. ----, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); Comins v. Scrivener, 214 F.2d 810, 814 (10th Cir.1954). In the instant case, we hold that there is sufficient evidence to find that defendant had a duty to cooperate in marketing a four-mountain ticket, and that its refusal to do so, considered together with its other acts, supported the finding of monopolization.
 
 
 [19]
 Plaintiff's expert was Ted Farwell of Boulder, Colorado. Mr. Farwell was a ski area planner, consultant and appraiser, with a bachelor's and master's degree in business administration, and 20 years' experience in his field. VIII R. 1163. He was a former competitive skier himself, skiing for the University of Denver, and on three United States Olympic teams. Id. at 1170
 
 
 [20]
 There was evidence that plaintiff's mountain was of equivalent desirability to defendant's mountains. There was testimony that plaintiff's mountain was "the finest, well-balanced mountain in the Aspen area." IV R. 502. One witness testified that he "prefer[ed] [plaintiff's mountain] as a ski area," and that he recommended plaintiff's ski school over the others because it is a "friendly area." VII R. 983; see also id. at 985-86. There was also testimony from a member of defendant's board of directors that if a four-mountain ticket had been offered in 1978-79, defendant would not have marketed its three-mountain ticket at the same time. Exhibit 33, III App.; V R. 585
 
 
 [21]
 Defendant also argues that Farwell's projections "were attributed at least in part to what the trial court found to be [defendant's] lawful competition--its offering of its own 3-area ticket." Brief of Defendant-Appellant, Cross-Appellee, at 66 (emphasis in original). Defendant argues that the judgment must be reversed because, as in Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338 (3d Cir.1975), plaintiff's expert relied on defendant's lawful conduct in projecting damages. We disagree for two reasons
 First, we have explained above that we must look at the evidence as a whole in determining whether defendant violated Sec. 2. Whatever the propriety of marketing its own three-day ticket in other circumstances, we must conclude that defendant cannot complain of Farwell's reliance on its offering of the three-day ticket in conjunction with the other evidence of monopolization in this case, especially where defendant has acquiesced in the jury's return of a general verdict. "But however innocent such agreements might be, standing alone, they would assume quite a different aspect if utilized as essential features of a program to hamper or destroy competition." Associated Press, supra, 326 U.S. 14, 65 S.Ct. at 1422.
 Second, Farwell's projections do not assume that the three-day ticket is illegal. Instead, the projections merely assume that defendant would refrain from offering the three-day ticket. As we have explained earlier, there is support in the record for this assumption. See supra note 20.
 
 
 [22]
 Defendant makes a broad challenge to the admission of the testimony of plaintiff's expert. In addition to the challenge that the testimony was inadmissible because grounded on false assumptions, which we have rejected, defendant also argues that even if the expert evidence was otherwise admissible it should have been excluded as misleading and confusing. See Fed.R.Evid. 403. Brief of Defendant-Appellant Cross-Appellee at 68. We note that under Rule 403, Fed.R.Evid., the "task of balancing the probative value of evidence against danger of confusion of the issues is one for which the trial judge because of his [or her] familiarity with the full array of evidence in the case, is particularly suited." Rigby v. Beech Aircraft Co., 548 F.2d 288, 293 (10th Cir.1977). We will not disturb the trial court's decision on this issue unless it is an abuse of discretion. See, e.g., Whiteley v. OKC Corp., 719 F.2d 1051, 1057 (10th Cir.1983); Texas Eastern Transmission Corp. v. Marine Office-Appleton & Cox Corp., 579 F.2d 561, 567 (10th Cir.1978); Rigby v. Beech Aircraft Co., 548 F.2d 288, 293 (10th Cir.1977). We cannot say it was an abuse of discretion to refuse to exclude the expert's testimony under Rule 403
 
 
 [23]
 Defendant criticizes Farwell's damage estimate for 1977-78 on the ground that the four-mountain ticket was actually offered during this year, contrary to the apparent assumption of Exhibit 101. However, this defect is not fatal to the verdict when we consider the amount of damages attributed to this year in comparison with the other damage years. Under his more conservative Method B, Farwell attributed between $884,400 and $991,300 in damages for each of the years 1978-79 through 1980-81, during which the four-mountain ticket was not offered. The total damages attributed by Farwell to these three years was over $2.8 million, which was greater than the jury's damage award for the four damage years in question. Farwell's estimate of $354,300 in damages for 1977-78, during which the four-mountain ticket was offered, therefore should be viewed in light of Farwell's estimated damages for 1978-79 through 1980-81 and the actual damages awarded by the jury. See Midwest Underground Storage, Inc., supra, 717 F.2d at 501 (upholding jury damages award that was "within the range of the evidence")