590 F.2d 860
 4 Fed. R. Evid. Serv. 205
 SCHOLZ HOMES, INC., Plaintiff-Appellant-Cross-Appellee,
v.
Wayne O. WALLACE, Jr., M. D. and Mrs. Wayne Wallace, Jr.,
Defendants-Counterclaimants-Appellants-Cross-Appellees,
v.
Richard A. LUTES, Counterdefendant-Appellant-Cross-Appellee.
 Nos. 76-1258, 76-1259.
 United States Court of Appeals,
Tenth Circuit.
 Argued Aug. 10, 1978.
Decided Jan. 18, 1979.
 
 Kenneth F. Crockett, Topeka, Kan. (with Eugene W. Hiatt, Topeka, Kan., on brief), of Hiatt, Crockett, Hiatt & Carpenter, Chartered, Topeka, Kan., for Scholz Homes, Inc. and Richard A. Lutes.
 Charles D. McAtee, Topeka, Kan. (with Paul H. Hulsey, Topeka, Kan., on brief), of Eidson, Lewis, Porter & Haynes, Topeka, Kan., for Wayne O. Wallace, Jr., M. D., and Mrs. Wayne Wallace, Jr.
 Before McWILLIAMS, BARRETT and McKAY, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 In the fall of 1971 Dr. Wayne O. Wallace, Jr. and his wife became interested in building a family residence by obtaining a "package" home manufactured by Scholz Homes, Inc. (Scholz). Their initial written inquiries were answered in person by Richard A. Lutes, a Scholz district sales manager, who showed the Wallaces promotional materials and discussed with them various packages and their costs.
 
 
 2
 The promotional materials stated that a Scholz representative would "provide cost figures" and "select a builder" for the package home purchaser. Record, supp. vol. 1, at 94. Lutes suggested, as a rule of thumb, that the total cost of the package home construction would be three times the cost of the package itself. The Wallaces contemplated obtaining the "Contempera Supreme In-Line" package costing $35,000. Under Lutes' rule of thumb the house would have cost $105,000 approximately within the $100,000 price range the Wallaces desired. Lutes advised the Wallaces that he would look for a builder since neither he nor they knew one in the Atchison, Kansas area "compatible" with Scholz products. Record, vol. 7, at 58-60.
 
 
 3
 Through the assistance of other Scholz representatives Lutes found Construction Systems, Inc. (C.S.I.), an Iowa corporation with Scholz building experience. C.S.I. was in deep financial trouble at this time and owed Scholz for an apartment package under construction in Iowa. C.S.I.'s financial difficulties notwithstanding, Lutes arranged for a meeting between C.S.I. representatives, Lutes and the Wallaces to discuss the feasibility of building the Wallaces' house. Later, Lutes was advised that the C.S.I. stockholders were going to form a Kansas corporation, Tra-Kel Enterprises, Inc. (Tra-Kel), to build the Wallace home. On March 8, 1972, the Wallaces examined and dated a prospective contract with Tra-Kel. On March 16 Tra-Kel ordered a Contempera Supreme In-Line Package through Lutes, and on March 22 Tra-Kel formally contracted with the Wallaces to build the house for $107,410.
 
 
 4
 In April, after construction had commenced and the Wallaces had paid Tra-Kel $25,000 in progress payments, Dr. Wallace was contacted by Scholz' Iowa representative. During their conversation, Dr. Wallace was informed of C.S.I.' § financial difficulties and was advised to cease his progress payments and require a finished product before further payments were made. Following this obviously disturbing conversation, Dr. Wallace contacted Lutes to apprise him of this information. Lutes said he would check with Scholz regarding Tra-Kel's financial situation. On April 15 Lutes informed Dr. Wallace that according to Scholz' credit manager, Mr. Brandys, and regional sales manager, Mr. Piper, "Scholz Homes had done some checking and (Tra-Kel was) still okay" financially. Record, vol. 7, at 350. Lutes also led the Wallaces to believe that "he had clout to make (Tra-Kel) perform." Record, vol. 7, at 351.
 
 
 5
 In early May, 1972, Dr. Wallace received a telephone call from Mr. Brandys, Scholz' credit manager, who was concerned about Tra-Kel's payment for the house package which was then in transit. The two men discussed the possibility of the Wallaces establishing an escrow agreement to guarantee Scholz payment for the package. After this conversation Dr. Wallace believed Brandys understood the Wallaces' concern over Tra-Kel's performance. Dr. Wallace testified at trial that he had given Brandys no assurances of payment for the house package. On the other hand, Brandys apparently believed that Dr. Wallace had assured Scholz of payment for the package. Brandys further felt that he had given Dr. Wallace no assurances of performance by Tra-Kel.
 
 
 6
 On May 8 the Scholz package arrived, C.O.D., at the Wallaces' building site. The package was unloaded, but no money was paid. A meeting involving Dr. Wallace, Lutes, Tra-Kel stockholders, and the Wallaces' attorney was held that same day. As a result of this meeting, a new agreement between the Wallaces and Tra-Kel was formulated. The agreement provided for payment to Scholz for the package via an escrow arrangement and stated that the package cost would "be paid to Scholz Homes, Incorporated, when said 'building package' is installed under roof, with trim delivered, and lien waivers granted to date, and is otherwise complete." Record, supp. vol. 1, at 9. Pursuant to this arrangement, the Wallaces' attorney prepared an escrow agreement which named the City National Bank of Atchison, Kansas, as escrow agent and called for a deposit of $34,558.16, the package home price, with the agent. The agreement also provided that no moneys were to be paid until the Wallaces received duly executed lien waivers on "all work completed to date of payment on the 'building package.' " Record, supp. vol. 1, at 15. The escrow agreement was executed by the Wallaces and by Mr. Brandys for Scholz Homes, Inc., but it was never presented to the bank. On May 26, the Wallaces terminated their contract with Tra-Kel for breaches resulting from Tra-Kel's failure to pay subcontractors, obtain lien waivers, and pay interest on advanced moneys as per that contract. The $34,558.16 mentioned in the escrow agreement was never deposited with the escrow agent. The Wallaces believed that since Tra-Kel was in default the contract was void, and the purpose of the escrow agreement had been thwarted.
 
 
 7
 The Wallaces continued construction under their own supervision and completed the house at a total cost of $147,636.25, excluding the Scholz package price which was never paid.
 
 
 8
 Scholz brought suit to recover the price of the package. The Wallaces counterclaimed for their costs above the $107,000 Tra-Kel contract on the theory that they had been fraudulently induced by Scholz to enter the contract with Tra-Kel.
 
 
 9
 The trial court ruled as a matter of law that: (1) the May 8 contract failed for lack of consideration; (2) the escrow agreement was unenforceable for lack of delivery; (3) any oral agreements between the Wallaces and Scholz merged in the contract and escrow agreement and failed with them; (4) the Wallaces could not prevail under a benefit of the bargain theory; (5) the Wallaces suffered damages equal to the difference between what it cost them to build the house and what it would have cost if they had contracted with a competent and solvent builder; and (6) Scholz' evidence supported only a claim of unjust enrichment under an implied contract theory. The case was then submitted to the jury. Judgment for the Wallaces was entered in the amount of the jury verdict $20,000 actual damages and $5,000 punitive damages and the trial court denied Scholz' motion for a new trial. Both parties appealed.
 
 THE APPEAL
 
 10
 Scholz' first contention on appeal is that the trial court erred in determining that the escrow agreement was unenforceable for nondelivery of either the document of agreement or the $34,558.16 specified in it. The trial court's reliance on Wilson v. Woolverton, 137 Kan. 663, 21 P.2d 313 (1933), cited with approval in Truax v. Southwestern College, 214 Kan. 873, 522 P.2d 412, 418 (1974), was well founded. The rule is there articulated that
 
 
 11
 in order that an instrument may operate as an escrow, not only must there be sufficient parties, a proper subject-matter, and a consideration, but the parties must actually contract, and the deposit must be absolute and beyond the control of the depositor.
 
 
 12
 21 P.2d at 315. In light of these authorities, we agree with the trial court.
 
 
 13
 Scholz next claims the trial court erred by allowing the Wallaces' counsel to impeach the deposition testimony of his own witness, a Scholz representative admittedly adverse to the Wallaces. Rule 607 of the Federal Rules of Evidence is dispositive, and was correctly relied on by the trial court. It provides that "the credibility of a witness may be attacked by any party, including the party calling him." Scholz claims that the trial court misapplied Rule 607. Contrary to Scholz' contentions, Rule 607 is not limited to instances in which the party calling the witness is surprised, misled or entrapped. See 10 Moore's Federal Practice § 607.02 (2d ed. 1976). We do not attach significance to the fact that the Wallaces' attorney could properly have omitted the undesirable portions of the witness' deposition when it was read into the record.
 
 
 14
 Scholz next urges error in the trial court's permitting William Hale, an architect, to testify as an expert witness for the Wallaces. While some of Hale's opinions and testimony seem to have been based upon speculation derived from incomplete data, he fully disclosed any inadequacies in the information he was relying on and he was subjected to a thorough cross-examination. Trial courts have broad discretion in determining the extent to which expert testimony is admissible. Bridger v. Union Railway Co., 355 F.2d 382, 387 (6th Cir. 1966); Krizak v. W. C. Brooks & Sons, Inc., 320 F.2d 37, 42 (4th Cir. 1963); 11 Moore's Federal Practice § 703.10(3) (2d ed. 1976). We find no abuse of discretion in this case.
 
 
 15
 Scholz also challenges the refusal of the trial court to give requested jury instructions on agency and contract implied-in-fact. The court below chose instead to submit the case to the jury on a theory of contract implied-in-law. Scholz argues on appeal that the instructions given were not supported by the evidence. It does not appear, however, that this argument was ever presented to the court below, and no objection was there raised over the refusal to give the requested instruction.
 
 
 16
 Rule 51 of the Federal Rules of Civil Procedure provides:
 
 
 17
 No party may assign as error The giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.
 
 
 18
 (Emphasis added.) Absent plain and fundamental error we accordingly refuse to consider these contentions which were not properly presented below. See Taylor v. National Trailer Convoy, Inc., 433 F.2d 569, 570-71 (10th Cir. 1970); Crossland v. Continental Casualty Co., 374 F.2d 586, 589 (10th Cir. 1967).
 
 
 19
 Scholz next alleges that the trial court should have granted Scholz' motion for a new trial on the grounds that the verdict was: (1) excessive; (2) contrary to the clear weight of the evidence; and (3) the result of distortion and misconstruction of the evidence. We disagree on all three points. The record reveals that the trial court was well within its broad discretion in denying the new trial motion. Richardson v. Communications Workers of America, 530 F.2d 126, 129 (8th Cir.), Cert. denied, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); Community National Life Insurance Co. v. Parker Square Savings & Loan Association, 406 F.2d 603 (10th Cir. 1969); Campbell v. Clark, 271 F.2d 578 (10th Cir. 1959); 6A Moore's Federal Practice P 59.05(5) (2d ed. 1974); 11 C. Wright & A. Miller, Federal Practice and Procedure, Civil §§ 2803, 2818 (1973).
 
 
 20
 Scholz' other allegations of error are also without merit.
 
 THE CROSS-APPEAL
 
 21
 In their cross-appeal, the Wallaces question the propriety of the trial court's limiting their measure of damages to the difference between the actual cost of their house and what it would have cost had they originally contracted with a reputable and solvent builder. The Wallaces contend that the proper amount of damages under either the "benefit of the bargain" rule or under the "out of pocket loss" rule is $40,226.22 the amount the Wallaces expended to complete their home in excess of the Tra-Kel contract price. We disagree.
 
 
 22
 The Wallaces' calculation of damages is justifiable under the benefit of the bargain test. Kansas readily allows this measure of recovery in fraud and deceit cases involving two parties. E. g., Walker v. Fleming Motor Co., 195 Kan. 328, 404 P.2d 929 (1965). However, we find no Kansas authority allowing such a recovery against a defendant who fraudulently induces the plaintiff to contract with a third party. In such a circumstance, the rationale for the benefit of the bargain rule is less persuasive, and the plaintiff generally is placed in the position he would have occupied had he not been defrauded. See Sorensen v. Gardner, 215 Or. 255, 334 P.2d 471 (1959). In other words, plaintiff is entitled to an "out of pocket loss" measure of recovery.
 
 
 23
 Had the Wallaces not been defrauded, they would have contracted with a solvent and reputable builder. Their own expert witness testified as to the price such a builder would have charged for the house they desired and ultimately received. The out of pocket loss the Wallaces actually sustained is therefore correctly measured as the difference between the price a reputable and solvent builder would have charged for what the Wallaces received and what they paid for it.
 
 
 24
 The judgment of the district court is therefore in all respects affirmed.