**Perry and Martha ARNOLD, Individually and as Parents and Guardians of James R. Arnold, and James R. Arnold, Plaintiffs,**

v.

**RIDDELL, INC., and Midwest Athletics, Inc., Defendants.**

Civ. A. No. 90–1485–FGT.

United States District Court,
D. Kansas.

March 24, 1995.

---

**3.** The motion was filed in CR–94–171–FVS as document number 46.

Richard D. Cordry, Wichita, KS, Theodore J. Caldwell, Jr., Litvin, Blumberg, Matusow & Young, Philadelphia, PA, for Perry Arnold and Martha Arnold.

Richard D. Cordry, Wichita, KS, Charles G. Young, III, Theodore J. Caldwell, Jr., Litvin, Blumberg, Matusow & Young, Philadelphia, PA, for James R. Arnold.

Stephen G. Dickerson, Kugler & Dickerson, David A. Hoffman, Donald W. Vasos, Law Offices of Donald W. Vasos, Kansas City, KS, for Riddell, Inc.

### MEMORANDUM AND ORDER

THEIS, District Judge.

This is a product liability action brought against the manufacturer of a football helmet.[1] The case was tried to a jury commencing September 27, 1994. The jury found in

---

1. The other named defendant, a reconditioner of the helmet, has gone out of business and was never served.

favor of the plaintiffs, and judgment was entered according to the verdict. This matter is before the court on motions for judgment as a matter of law or, in the alternative, for a new trial filed by defendant (Doc. 148) and plaintiffs (Doc. 159).

In the fall of 1988, plaintiff James R. Arnold ("J.R.") was a junior at Ashland High School in Ashland, Kansas. J.R. was the quarterback on the school's football team. As part of J.R.'s uniform, he wore a PAC–3 helmet manufactured by the defendant, Riddell, Inc. ("Riddell").

During a game on October 28, 1988, J.R. was injured when he collided head first with John Bauer, an opposing player, while trying to recover a fumble. J.R.'s spine fractured at the C4–C5 level, causing permanent quadriplegia and respirator dependence. The nature and extent of J.R.'s injuries are not contested. It is undisputed that this type of injury occurs only when a person's neck is flexed by a lowering of the head and when the force exerted on the neck is around 1000 pounds or more.

The plaintiffs contended that the PAC–3's energy attenuation system was defective in that it was not designed to minimize forces to the neck despite Riddell's knowledge that quadriplegic injuries were occurring and that other helmets, including Riddell's own Microfit, better managed forces to the neck. Furthermore, the plaintiffs contended that J.R.'s injury was a threshold or marginal injury, meaning that the level of force generated in the collision was near the 1000 pounds necessary to fracture a neck. Therefore, plaintiffs argued that had Riddell properly designed the PAC–3's energy attenuation system, J.R. would not have sustained a quadriplegic injury.

The defendant contended at trial that no helmet can prevent a cervical spine injury. The defendant argued that it is playing technique rather than equipment that causes or prevents this type of injury. The defendant presented expert testimony that the force levels to J.R.'s neck were much higher than the 1000 pound threshold and that, therefore, the better energy attenuation of other helmets would not have been enough to prevent the injury. Finally, the defendant contended

that J.R. Arnold and/or his parents were at fault for J.R.'s injury.

The most hotly contested issues in this case were whether the PAC–3 was defective and whether any defect proximately caused J.R.'s injury. All helmet testing discussed at trial, whether performed by plaintiffs' experts, defendant's experts, or defendant's own employees, showed that the Riddell PAC–3 helmet did not perform as well on crown impacts as the Riddell Microfit helmet or the Bike Air Power helmet, made by another manufacturer. The other helmets tested between 20% and 50% better on crown impacts. It was undisputed that lower force levels were recorded when Riddell experimented with increasing the energy attenuating pads by ⅛ inch in the crown. Nevertheless, Riddell decided against adding the extra padding.

The jury found the PAC–3 helmet defective and assessed Riddell's fault at 63%. The jury found that J.R. Arnold was 21% at fault and his parents were 16% at fault. The jury assessed damages at over $12 million, finding that plaintiff J.R. Arnold was entitled to no damages for pain and suffering. The defendant now moves for judgment notwithstanding the verdict or, in the alternative, a new trial. The plaintiffs move for judgment notwithstanding the verdict on the issue of their fault.

## I. Defendant's Motion for JNOV

The defendant moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and presents several arguments in support of that motion. The defendant argues that the plaintiffs' claims are barred by the applicable statute of limitations, that their claims are barred by the statute of repose found in the Kansas Product Liability Act, and that the only competent evidence presented at trial supports the defendant's position as to liability.

In reviewing a motion for judgment notwithstanding the verdict (JNOV), the court applies the same standard governing directed verdicts. *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 498 (10th Cir. 1984). It is not the function of the court to

weigh the evidence or to make credibility determinations. *Id.* at 499. Rather, "the trial court must view the evidence most favorably to the party against whom the motion is made, and give that party the benefit of all reasonable inferences." *Id.* at 498. Thus, the court may grant a motion for JNOV "only if the evidence points but one way and is susceptible to no reasonable inference which may support the opposing party's position." *Q.E.R., Inc. v. Hickerson,* 880 F.2d 1178, 1180 (10th Cir.1989).

## A. Statute of limitations

Defendant bases its first argument for summary judgment on K.S.A. § 60–513, which provides in pertinent part:

> (a) The following actions shall be brought within two years:
>
> . . . . .
>
> (4) An action for injury to the rights of another, not arising on contract, and not herein enumerated.
>
> . . . . .
>
> (b) Except as provided in subsection (c), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, ... but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.

■ The court holds, as it held before trial, that because the plaintiffs allege a defect in the helmet padding, the act giving rise to the cause of action occurred no sooner than when the padding was manufactured. The court rejects defendant's argument that the date of the helmet shell's manufacture controls.[2] The crown padding in J.R. Arnold's helmet was manufactured in 1982 and was installed as part of a periodic reconditioning and recertification process in either 1983 or 1986. Therefore, this action, commenced in 1990, is timely under K.S.A. § 60–513(a)(4) and (b).

■ Furthermore, the Kansas Supreme Court has held that K.S.A. § 60–513(b) does not apply in product liability actions that involve exceptions to the statute of repose found in the Kansas Product Liability Act. *Kerns v. G.A.C., Inc.,* 255 Kan. 264, 271–72, 875 P.2d 949 (1994). As discussed below, this is such a case.

## B. Statute of repose

■ Defendant's next argument is based on the Kansas Products Liability Act, under which a manufacturer is not liable for injuries caused by a product whose "useful safe life" has expired. K.S.A. § 60–3303(a)(1). The seller bears the burden of proving the expiration of the useful safe life of its product. *Id.* However, there is a presumption that any harm caused more than ten years after delivery was caused after the useful safe life had expired. K.S.A. § 60–3303(b)(1). The presumption may be rebutted only by clear and convincing evidence. K.S.A. § 60–3303(b)(1).

■ In this case, the court holds that the presumption found at K.S.A. § 60–3303(b)(1) does not apply. It is undisputed that football helmets are certified to meet standards set by the National Operating Committee on Standards for Athletic Equipment ("NOCSAE"). Helmets are designed to be reconditioned periodically and recertified as meeting the same NOCSAE standard that applies to new helmets. J.R. Arnold's helmet was reconditioned, fitted with new pads, and recertified in both 1983 and 1986. The crown pads in J.R. Arnold's helmet were manufactured in 1982. The court holds that where, as here, the product is designed to be reconditioned and is recertified to meet the standards set for a new product, and where the alleged defect is in the replacement part itself, the useful safe life begins to run at the time of reconditioning.

The court rejects defendant's argument that the date of original shipment controls. At any rate, defendant's contention that the helmet was originally shipped more than ten years before J.R. Arnold's injury is speculation based on the testimony of a Riddell employee that most helmets are shipped in

---

**2.** It is unclear when the helmet shell was manufactured, although it is undisputed that it was originally shipped from Riddell before September 1979.

the year of their manufacture. It is not even clear when the shell of J.R.'s helmet was manufactured.

This case is distinguishable from *Baumann v. Excel Indus., Inc.*, 17 Kan.App.2d 807, 845 P.2d 65 (1993), in which the Kansas Court of Appeals held that the mere manufacture of replacement parts is insufficient to support a finding that the useful safe life of a product, in that case a mower, is more than ten years and that the installation of new parts does not reset the clock for the entire product. First, in *Baumann*, unlike this case, the alleged defect was not in the parts that were actually replaced. Second, the mower was not designed to have periodic replacement of parts. Third, and most importantly, the mower was not recertified to the standards set for a new mower when parts were replaced. In *Strunk v. Lear Siegler, Inc.*, 844 F.Supp. 1466, 1469–70 (D.Kan. 1994), the court distinguished *Baumann* and held that the manufacture of replacement parts bears on the useful safe life of a product where there is other evidence that the product is built to last more than ten years. In this case, because the PAC–3 was not only designed to have parts replaced, but was recertified to meet the standards set for a new helmet, the court concludes that the clock resets on the useful safe life at the time of reconditioning, at least in a case where the alleged defect involves parts that were replaced.

Defendant relies solely on the presumption and does not argue that it otherwise met its burden of proving that the helmet had exceeded its useful safe life at the time of J.R. Arnold's injury. Therefore, defendant is not entitled to judgment as a matter of law based on the Kansas Product Liability Act's statute of repose.

There is a second reason that the statute of repose does not bar this action. K.S.A. § 60–3303(b)(2)(D) provides that the ten-year presumption does not apply "if . . . the injury-causing aspect of the product that existed at the time of delivery was not discoverable by a reasonably prudent person until more than ten years after the time of delivery, . . ." In determining whether the injury-causing defect of the PAC–3 padding system was reasonably discoverable prior to J.R. Arnold's injury, the court asks the following question: "Under the circumstances of this case, would a careful person, without placing himself or herself in danger, have been able to comprehend the danger and determine how to avoid the danger?" *Baumann*, 17 Kan.App.2d at 819, 845 P.2d 65.

■ In this case, the injury causing aspect of the PAC–3 helmet padding was not discoverable by a reasonably prudent person. J.R. Arnold could not have discovered the defect by inspection or by normal, prudent use of the helmet. The jury found the PAC–3 padding system defective based on expert testimony involving testing by biomechanical engineers who employed everything from sophisticated instruments, such as accelerometers (used to measure force levels), to cadavers (used for evaluating the effects on the human body of impacts to the top of the head). Obviously, such testing procedures are not feasible for the average high school football player. The jury heard evidence that increasing the energy attenuation material inside the pads by as little as ⅛ inch improves energy management 20% or more. This would not be apparent to the reasonably prudent user of a football helmet.

■ As for the ability to avoid the danger posed by the defect, it is not disputed that J.R. Arnold knew the playing techniques that have dramatically reduced the number of quadriplegic injuries in the last twenty years. Defendant and its experts have acknowledged that J.R. did nothing wrong in his execution of the play that led to his injury. There is no doubt that J.R.'s head was lowered during the fumble recovery, but no one contended that J.R. intentionally placed his head in this at-risk position. It is important to remember, in assessing J.R.'s ability to avoid the danger posed by the defect in the PAC–3's energy attenuation system, that a football helmet is a safety device. Its precise purpose is to protect players who are hit in the head. It would be no answer, then, to say that a reasonably prudent wearer of the PAC–3 could have avoided quadriplegic injury by avoiding a blow to the top of the head like the one J.R. suffered.

The court concludes that the exception to the statute of repose indisputably applies in this case. Therefore, the action is timely, and defendant is not entitled to judgment as a matter of law based on K.S.A. § 60–3303.

## C. Evidence to support plaintiffs' verdict.

The defendant next seeks judgment as a matter of law as to the issues of inadequate warning, defect of the helmet, and negligent testing and inspection. The defendant argues that there was no evidence from which a reasonable jury could find for the plaintiffs as to these matters. The court disagrees.

 As to inadequate warning, evidence was presented of the content of the warning on the PAC–3 helmet itself, as well as other methods of warning employed by Riddell to alert players to the risk of neck injury. Essentially, Riddell warned players that a football helmet cannot prevent *all* neck injuries. The jury heard the defendant's theory in this case that a football helmet offers no protection against neck injury. There was no evidence presented that Riddell ever warned players that its helmets could not prevent *any* neck injuries. The plaintiffs also presented evidence that the defendant knew its helmets did not perform as well as others on crown impacts, but did not warn players or coaches of this fact. J.R.'s coaches testified that information about the relative safety of equipment is important for making purchasing decisions. The defendant presents no authority for its argument that expert testimony is necessary to prove a warning is inadequate. Furthermore, as discussed below, Kansas law provides a rebuttable presumption that an adequate warning will be heeded and that an inadequate warning proximately caused the injury. Thus, it was not necessary for the plaintiffs to put on any evidence that a different warning would have prevented J.R.'s injury.

 The defendant next argues that there was no competent evidence from which the jury could find that the PAC–3 was defective and unreasonably dangerous. The court disagrees. The jury heard testimony from several expert witnesses. The plaintiff presented expert testimony from Dr. James Lafferty and Dr. Richard Stalnaker, both professors in biomechanical engineering. Dr. Lafferty and Dr. Stalnaker testified concerning their testing which compared the PAC–3 helmet to other helmets on the market. Dr. Stalnaker also testified about testing he conducted on individual pads from the PAC–3 helmet. Both were of the opinion that the PAC–3's energy attenuation system was defective.

Furthermore, some of the testimony elicited from defendant's experts supports plaintiffs' position that the PAC–3 was defective and unreasonably dangerous. Dr. Bishop, although of the opinion that the Riddell PAC–3 provided adequate protection, found that force levels to the neck were higher with the PAC–3 than with other helmets he tested. On cross examination, Dr. Bishop agreed that J.R. Arnold was entitled to the extra protection that would have been afforded by these other helmets or by extra padding in the PAC–3. Dr. Torg disagreed that improved padding would help prevent quadriplegic injury. However, this was based on Dr. Torg's fear that with improved equipment, players would revert to "heads down" playing techniques, which would, in turn, place the players at greater risk of cervical spine fractures.

The defendant next argues that the testimony of Dr. Stalnaker was inadmissible, based on the requirements for admission of expert testimony and on procedural grounds. The court will address the procedural arguments below in connection with the defendant's motion for new trial.

 Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In deciding whether expert testimony is admissible under Rule 702, the court must determine whether the proposed testimony involves "(1) scientific knowledge that (2) will

assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). The second prong requires that the testimony meets a threshold of reliability. Among the factors to consider are: (1) whether the theory or technique has been, or can be, tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) the degree of acceptance of the theory or technique within the relevant scientific community. *Id.* at —— ———, 113 S.Ct. at 2796–97.

■ In this case, there is no question that Dr. Stalnaker testified to scientific knowledge. Furthermore, the defendant did not and does not object to Dr. Stalnaker's qualifications to testify as an expert in the field of biomechanical engineering. Rather, the defendant argues that Dr. Stalnaker's testimony did not meet the second prong of the *Daubert* standard because some of the four factors the Supreme Court set forth are not met in this case.

The first factor, whether the theory has been tested, is clearly met in this case. Dr. Stalnaker testified to the testing he conducted and how the testing supports his theories. The third factor also points to admissibility of Dr. Stalnaker's testimony. Dr. Stalnaker's tests of the PAC–3 were conducted in a controlled environment. Although his opinions regarding defect differed from those of defendant's experts, some of his tests yielded similar results.

■ The second and fourth factors address similar concerns. In this case, Dr. Stalnaker's testing, his opinion that the PAC–3 was defective, and his opinion that football helmets play a role in neck protection, have not been the subject of any peer reviewed articles. Moreover, his opinions conflict with those of the biomechanical engineers who have published articles on the

subject, most of whom were expert witnesses for the defense. However, the Supreme Court stated in *Daubert* that this alone does not render the evidence inadmissible. *Id.* at ——, 113 S.Ct. at 2797. Although Dr. Stalnaker's ultimate opinions may not have gained general acceptance, his testing methods were those generally employed by biomechanical engineers, including defendant's experts, and his test results were consistent with those of other biomechanical engineers. The court notes that under defendant's approach to Rule 702 and the *Daubert* standard, some of the defendant's own expert testimony, including Dr. Burstein's opinion regarding J.R.'s velocity, would have been inadmissible.

■ Defendant makes much of the plaintiffs' "threshold injury" theory and argues that it is invalid because no article has been published discussing "threshold injury." Although articles in biomechanical journals do not address threshold injury, the concept is based on the undisputed principle that a cervical spine fracture occurs when force levels reach approximately 1000 pounds.[3] In other words, around 1000 pounds is the threshold of injury. The plaintiffs and their witnesses used the terms "threshold injury" and "marginal injury" to refer to a cervical spine fracture which resulted from a force level at or near 1000 pounds of force. The witnesses gave their opinions that J.R. Arnold's injury was a threshold injury based on the nature and extent of the damage to his cervical spine and analysis of the play during which he was injured. Permitting the experts to testify in terms not used in the scientific literature was proper. Expert testimony on matters of science would be of little value if the expert witnesses were restricted to using technical jargon and were prohibited from explaining scientific concepts in language more familiar to the average person.

3. The concept of a threshold injury really relates to causation. Plaintiffs argued that because the force applied to J.R. Arnold's cervical spine was just enough to cause a fracture, better energy attenuation by the helmet would have prevented the injury. Defendant, on the other hand, argued that the force level was somewhere in the 4000 to 5000 pound range and that any feasible improvement in a helmet's force attenuation would not have been enough to prevent J.R.'s injury. Because "threshold injury" relates to causation, it is not surprising or troubling that the term appears in litigation rather than in scientific literature.

The court rejects defendant's contention that Dr. Stalnaker's testimony would be admissible only if he had designed and built an alternative to the PAC–3. Dr. Stalnaker offered suggestions as to how the PAC–3's design could have been changed to better attenuate energy and also testified that the Microfit and Bike Air helmets were examples of helmets with adequate energy attenuation.

■ Finally, the defendant argues that the jury could not reasonably find defendant was negligent in its testing and inspection of the PAC–3. The court disagrees. Riddell contends that football helmets do not protect against neck injuries, but did no testing regarding that contention. Rather, Riddell relied on Dr. Torg's assertion that playing technique causes or prevents neck injuries, and failed to consider that although playing technique is critical to preventing neck injuries, equipment may play some role as well. Riddell's own expert, Dr. Bishop, testified that different helmets resulted in different forces to the neck upon impact to the crown. The only relevant testing Riddell conducted showed that crown impact forces were significantly reduced by adding ⅛″ extra padding, but Riddell failed to place additional padding in the crown of the PAC–3 and failed to consider the implications of this testing as it relates to forces generated on the neck. There was, therefore, sufficient evidence for the jury to find defendant's testing of its product was negligent.

## II. Defendant's Motion for New Trial

■ Next, the defendant moves for new trial, arguing that the court made various errors, including the admission or exclusion of evidence and its instructions to the jury. A trial court has broad discretion in deciding whether to grant or deny a motion for a new trial. *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984); *Scholz Homes, Inc. v. Wallace,* 590 F.2d 860, 864 (10th Cir.1979). Such a motion may be granted when the court believes the verdict to be against the weight of the evidence, when prejudicial error has entered the record, or when substantial justice has not been done. *Holmes v. Wack,* 464 F.2d 86, 88–89

(10th Cir.1972). Before a new trial will be granted, trial errors regarding admissibility of evidence and any other court rulings must affect the substantial rights of the parties. *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.,* 571 F.2d 1144, 1148–49 (10th Cir.), *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978).

### A. Admission/exclusion of evidence

■ The trial court's rulings as to the admission or exclusion of evidence are reviewable for abuse of discretion. *Acrey v. American Sheep Indus. Ass'n,* 981 F.2d 1569, 1575 (10th Cir.1992).

### 1. Evidence of prior accidents and lawsuits

Before the commencement of trial, defendant filed a motion in limine to exclude all references to other accidents and lawsuits involving the PAC–3 helmet unless the plaintiffs could show those incidents were substantially similar to the incident involved in this case. The court agreed and ruled that before any such evidence would be admitted, a hearing outside the presence of the jury would be held to determine whether the other incidents were substantially similar to the incident in this case. Such a hearing was held before Dr. Lafferty, the first biomechanical engineering expert called by plaintiffs, testified about other injuries involving the PAC–3 helmet. A list of prior lawsuits was presented to the court, and the court heard evidence on the similarity or dissimilarity of the cases. The court held that the plaintiffs had not made a sufficient showing of similarity as to some of the prior lawsuits. Plaintiffs never offered the remainder of the list into evidence, but references to other incidents were made during the testimony of the various experts.

■ Defendant contends that although the other incidents may show notice, that is not an issue in this case because defendant concedes it had notice of other quadriplegic injuries. Defendant's argument misconstrues the purpose for which plaintiffs offered the evidence of other incidents. The Tenth Circuit has held that other incidents

evidence is admissible in a product liability case to show notice of a potential defect. Defendant has not conceded notice of a potential defect, but concedes only notice of the other incidents themselves. Therefore, defendant's notice of a potential design defect in the PAC–3 helmet was at issue at trial. *But see King v. Emerson Elec. Co.*, 837 F.Supp. 1096, 1098 (D.Kan.1993) (where defendant admits notice of condition plaintiff claims to be defect, other incidents not admissible to show notice of that condition).

The other incidents evidence also goes to the defendant's duty to warn, the adequacy of the warning given, and the defendant's notice that the warning may have been inadequate. Plaintiffs argued at trial that if, as defendant claims, a football helmet cannot provide any protection to the neck, the defendant had a duty to so warn the users of the helmet.

■■■■ The court instructed the jury that the fact of other injuries was not evidence of negligence, but that evidence of prior injuries was to be considered "only as it relates to your determination of whether the defendant knew or should have known about any defect in the PAC–3 which could potentially cause injury to a wearer of the helmet. . . ." This instruction properly limited the jury's consideration of the evidence of other injuries. There is a presumption that the jury followed the court's instruction. *United States v. Rivera*, 778 F.2d 591, 599 (10th Cir.1985).

The court notes that nearly all the references to other lawsuits were made in the context of examining the expert witnesses about their prior testimony and their testing of helmets to show either inconsistency of such expert testimony or to show bias of the witness as a frequently used paid professional expert witness for either plaintiffs or defendant manufacturers in helmet cases. These references were made by defendant and plaintiffs alike and received no objections.

## 2. Video of NFL and college games

During plaintiffs' cross examination of Dr. Torg, plaintiffs showed a video tape of some college and NFL football games, during which players were hit on top of the head with their heads down. The players were not injured. The video was shown to impeach Dr. Torg's testimony that a player who is hit on top of his lowered head always suffers a quadriplegic injury. The video was used for impeachment purposes only and was not marked as an exhibit or entered into evidence.

■■■■ Defendant argues that the plaintiffs failed to lay a proper foundation for the evidence by showing that the plays involved PAC–3 helmets and similar impacts to that sustained by J.R. Arnold, that the evidence is hearsay without exception, that the defendant had no opportunity to cross examine the players involved, that the evidence is irrelevant because the plays occurred after J.R. Arnold's injury, that the video was not listed as an exhibit, and that the prejudicial effect and possible confusion from admitting the video substantially outweighed its probative value.

Defendant's arguments are without merit, largely because they ignore the purpose for which the plaintiffs used the video tape. Plaintiffs showed the video tape as impeachment after Dr. Torg refused to agree that sometimes a football player is hit on top of the head with his head down, but suffers no spinal cord injury. For that purpose, it was not necessary to lay the foundation that defendant would require. As impeachment, the evidence was not offered for the truth of the matter and, therefore, was not hearsay. The video tape was not listed as an exhibit because it was made during trial in response to other expert testimony offered by defendant.

The defendant has failed to show what it could have gained by cross examining the players on the video and how it was prejudiced by the court's decision to allow plaintiffs to use the video for impeachment.

## 3. Exclusion of "Play Safe" video

The defendant attempted to introduce into evidence a video called "Play Safe," which was developed by Dr. Burstein, one of defendant's expert witnesses, in consultation with the Craig Institute, the rehabilitation hospi-

tal where J.R. Arnold was treated. The court prohibited the defendant from showing the video, but permitted examination of the witness about his involvement in the making of the video, as it was relevant to his qualifications as an expert.

■ Defendant argues the video was admissible to show the types of warnings available to football players and as evidence of community expectations regarding the protective qualities of a football helmet. Because the video was made in 1993 and released in 1994, six years after J.R. Arnold's injury, it was not relevant as evidence of warnings available in 1988 or community expectations in 1988. The evidence was therefore inadmissible under Rule 402.

Furthermore, any probative value to be gained by showing the video would have been substantially outweighed by dangers of unfair prejudice to the plaintiffs. Because the court admitted portions of a video created by Dr. Torg, as well as Riddell posters, further evidence of the types of warnings available would have been merely cumulative. The danger of unfair prejudice was particularly high because the video was not available to J.R. Arnold before he was injured and because the video contained a good deal of information that would have been excludable as hearsay. The evidence was therefore excludable under Rule 403.

**4. Exclusion of evidence of settlement**

■ The plaintiffs reached a settlement with the Ashland School District's insurance carrier. As part of the settlement, the plaintiffs agreed to a subrogation clause. The defendant argues that the court erred in excluding evidence of the settlement agreement. The defendant argues that the subrogation clause constituted a potential financial benefit to the coaches who testified and that the evidence thus bears on their credibility. The court disagrees. The coaches did not have an interest in the outcome of this trial. Any financial benefit would go only to the insurance carrier. The evidence of the settlement was not relevant to the credibility of

the witnesses or any other issue in this case and was therefore inadmissible under Fed. R.Evid. 402 and 408.

Furthermore, the probative value of credibility evidence was quite small in this instance because the coaches were fact witnesses whose testimony was largely undisputed. Any probative value of the settlement evidence was substantially outweighed by the danger of unfair prejudice to the plaintiffs and confusion of the issues and was thus excludable under Rule 403. *See Orth v. Emerson Elec. Co.*, 980 F.2d 632 (10th Cir. 1992).

**5. Hyman computer tests**

Among defendant's expert witnesses was Dr. Albert Burstein. Dr. Burstein testified about the computer model he developed to represent the collision between J.R. Arnold and John Bauer. Additionally, Dr. Burstein testified that in his opinion, a player's neck will fracture regardless of the helmet the player wears if the impact occurs while the player is moving four feet per second.

The next day of trial, plaintiffs offered the testimony of Dr. William Hyman in rebuttal. Dr. Hyman is a professor of bioengineering who teaches mathematical modelling. Dr. Hyman testified as to the limitations of mathematical modelling, some of the erroneous assumptions he saw in Dr. Burstein's model, and his opinion that Dr. Burstein did not adequately validate his results. Dr. Hyman also testified, over defendant's objection, about computer runs he conducted the night before his testimony. According to Dr. Hyman, Dr. Burstein's own computer model conflicts with his testimony that a collision at four feet per second will cause a neck to fracture regardless of the use of a helmet.[4]

Defendant contends that Dr. Hyman's testimony was inadmissible as improper rebuttal because defendants did not have access to Dr. Hyman's computer test results until the day of his testimony. The court will address the defendant's argument in two parts: (1) whether the testimony was proper rebuttal,

4. The court allowed Dr. Hyman to testify about the results of his computer tests, but the results themselves were not admitted as exhibits, largely because they were computer print-outs that would have been incomprehensible and of no use to the jury.

and (2) whether the evidence of Dr. Hyman's computer testing should have been excluded because defendant did not have access to the information until the night before it was admitted.

The scope of rebuttal is a matter within the trial court's discretion. "Generally, where the evidence rebuts new evidence or theories proffered in the defendant's case in chief, that the evidence may have been offered in the plaintiff's case in chief does not preclude its admission in rebuttal." *Bell v. AT & T*, 946 F.2d 1507, 1512 (10th Cir.1991). In this case, Dr. Hyman's testimony responded directly to testimony by Dr. Burstein about his computer model. The plaintiffs did not rely on computer modeling in advancing their case. Even if plaintiffs could have presented the same testimony during their case in chief, they were not obligated to anticipate the defendant's case. Furthermore, Dr. Hyman's testimony would have been incomprehensible if presented before Dr. Burstein's testimony. For these reasons, the court did not abuse its discretion in permitting Dr. Hyman to testify in rebuttal.

Next, defendant contends the court should have excluded Dr. Hyman's testimony about his tests with Burstein's computer model because the defendant did not have access to the results until the night before Dr. Hyman testified. When Dr. Burstein testified, he expressed the opinion that a collision at a speed of as low as four feet per second would cause a cervical fracture. After this testimony, Dr. Hyman, at the request of plaintiffs' counsel, ran Dr. Burstein's computer model using various speeds, including four feet per second. Dr. Hyman testified that the results of these computer runs conflicted with Dr. Burstein's testimony. For example, running the equation using a velocity of four feet per second yielded a force of less than two hundred pounds.

Dr. Hyman was listed as an expert witness in the pretrial order, and defendant had the opportunity to depose Dr. Hyman. Defendant does not dispute the accuracy of Dr. Hyman's computer tests, but argues that plaintiffs' counsel could have had Dr. Hyman conduct these computer tests before trial. The plaintiffs did not anticipate Dr. Bur-

stein's testimony as to the force levels generated at four feet per second. They, therefore, had no occasion to ask Dr. Hyman to run the computer model until shortly before his testimony. For these reasons, the court properly allowed Dr. Hyman to testify about his run of the Burstein computer model, and the defendant has not shown that the court's ruling was prejudicial.

### 6. Stalnaker test results

The court has addressed defendant's substantive arguments regarding the admission of Dr. Stalnaker's testimony. The defendant also argues that some of Dr. Stalnaker's testimony should have been excluded because it involved test results which were not provided to the defense in a timely manner. In December 1992, Dr. Stalnaker conducted tests on PAC–3 pads in connection with another case against Riddell. These test results were disclosed to the defendant in connection with that case, but were not given to the defendant in connection with this case at the time of Dr. Stalnaker's deposition. The court denied defendant's motion in limine, but permitted the defendant to take supplemental depositions twice during trial. Because the defendant had already had access to the test results for over a year, the risk of prejudice was minimal. Moreover, any possible prejudice was cured by the defendant's opportunity to depose Dr. Stalnaker regarding the tests before he was called as a witness. The admission of this evidence was, therefore, within the court's discretion.

The court also rejects the defendant's argument that this evidence is inadmissible under K.S.A. § 60–3307, which deals with subsequent testing and product changes by the manufacturer.

### B. Support for jury verdict

### 1. Verdict not supported by the evidence

The defendant argues that it is entitled to a new trial because the portion of damages awarded to Perry and Martha Arnold is excessive. A jury's assessment of damages is not to be disturbed unless it is "so excessive as to shock the judicial conscience and to raise an irresistible inference

that passion, prejudice, corruption or other improper cause invaded the trial." *Palmer v. City of Monticello,* 31 F.3d 1499, 1508 (10th Cir.1994). In such a case, a new trial is necessary because the improper cause may have invaded the liability determinations as well as the damage calculations. However, a verdict which is excessive, but which is not the result of passion, prejudice, or another improper cause does not necessitate a new trial. *Mason v. Texaco,* 948 F.2d 1546, 1560 (10th Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992). When the jury errs only as to its assessment of damages, it is proper to condition the denial of a new trial on the plaintiff's acceptance of a remittitur. *Id. See also Klein v. Grynberg,* 44 F.3d 1497, 1504 (10th Cir.1995).

█ In this case, the damages awarded to Perry and Martha Arnold were excessive. Mr. and Mrs. Arnold sought only past out-of-pocket loss for the care of their son, which is a readily determinable, fixed item of damages. The plaintiffs put on evidence that the out-of-pocket loss was at least $437,000 and asked in closing argument for that amount. Nevertheless, the jury awarded Mr. and Mrs. Arnold $688,492 for out-of-pocket loss.

█ Although the award was excessive, the court does not believe the error calls for a new trial. This error was only as to assessment of one element of damages, and in a case with damages exceeding $12 million, it was a relatively small error. Out-of-pocket loss is an objectively determinable figure, and the figures presented at trial were largely undisputed. The parties agree that there was evidence of at least $437,000 in out-of-pocket loss. Nevertheless, in a five week trial, it is not surprising that the jury was unable to remember the numbers with precision. In fact, the jury asked during deliberations to see the overhead summary of damages presented during closing. The court denied the request because the overhead was used only for illustrative purposes during closing argument and had not been admitted as an exhibit.

The verdict does not imply that improper considerations entered the jury's deliberations. It is difficult to imagine that a jury which awarded no noneconomic loss to a respirator-dependent quadriplegic and which found these plaintiffs 37% at fault was swayed by passion, prejudice, or corruption in assessing damages or in determining liability. As stated above, the jury's liability determinations have sufficient evidentiary support.

For the foregoing reasons, the award of excessive damages to Mr. and Mrs. Arnold does not warrant a new trial. However, the court must correct the error. The court will, therefore, condition the denial of defendant's new trial motion on plaintiffs' acceptance of a remittitur from $688,492 to $437,000 for damages to Perry and Martha Arnold for expenses incurred for the care of J.R. Arnold while he was a minor. The court will grant the plaintiffs ten days in which to file a pleading stating whether they accept the remittitur. If they do not, the court will order a new trial on the issue of damages. If the plaintiffs accept the remittitur, they may not seek reinstatement of the original verdict on appeal. *Donovan v. Penn Shipping Co., Inc.,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977).

The court rejects the plaintiffs' argument that the award is justified because of testimony about Perry Arnold's lost income. The Arnolds did not seek damages for lost income, and although Perry Arnold testified that he quit working to care for J.R. full time after his injury, there was no evidence of the amount of income lost. Finally, the court rejects plaintiffs' argument that the defendant waived its right to argue the issue of excessive damages by objecting to the jury's request during deliberations to look at plaintiffs' summary of damages, which was never admitted as an exhibit.

**2. Defendant's motion for directed verdict**

Defendant next argues that it is entitled to a new trial because the court did not direct a verdict for the defendant in this case. As discussed in section 1.c above, there was sufficient evidence to present the case to the jury. Therefore, defendant was not entitled to a directed verdict and is not entitled to a

new trial based on the court's denial of the motion for directed verdict.

## C. Jury Instructions

Defendant quarrels with many of the court's instructions to the jury. Defendant argues first that the court erred in giving Instructions 7, 9, 10, 11, and 12, dealing with plaintiffs' failure to warn and inadequate testing claims, because the court should have directed a verdict on those claims. As stated above, those issues were properly before the jury. Defendant argues that Instruction 18, dealing with prior injuries and lawsuits, was improperly given because this evidence should not have been admitted. The court has addressed this issue in section II.A.1. above.

■■■ The instructions properly state the law, and most were taken from the Pattern Instructions for Kansas. Instruction 11 states that there is a rebuttable presumption "that an adequate warning will be read and heeded" and "that if the manufacturer's warning is inadequate, ... that the inadequate warning caused the injuries." The instruction defines presumption. This instruction accurately states Kansas law as set forth in *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 410, 681 P.2d 1038 (1984).

■■■ The defendant next argues that the court erred in refusing defendant's request for a special interrogatory on the verdict form regarding the theory of liability. The court fully instructed the jury on the theories of liability in the case, but the verdict form asked only whether the jury found any party at fault and asked for the percentage of fault assigned to each party. Federal Rule of Civil Procedure 49 permits, but does not require, special interrogatories. The Tenth Circuit has held that "when jury instructions comprehensively cover all material issues in the case, a district court does not abuse its discretion in denying a request for special interrogatories." *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1101 (10th Cir. 1991). Among the cases cited in *Wheeler* was a Fifth Circuit case upholding the district court's denial of a product liability defendant's request for special interrogatories

regarding theory of liability. *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 294–95 (5th Cir.1975). This court did not abuse its discretion in denying defendant's request.

■■■ Defendant argues that the court erred in failing to instruct the jury regarding reduction of damages to present value. The Tenth Circuit has held, however, that such an instruction is not required in a case, such as this one, in which neither party has provided any competent evidence of the inflation rate or the discount rate. *Miller v. Union Pacific R. Co.*, 900 F.2d 223, 226 (10th Cir.1990).

■■■ Finally, the defendant contends that the verdict form and Instruction 24 were erroneous in that they did not include the school district, the Ashland coaches, and the reconditioners as parties whom the jury could find at fault. The court properly denied the defendant's request to include these third parties because there was absolutely no evidence presented at trial from which the jury could have found them at fault. Furthermore, in the pretrial order, which governed the conduct of the trial, the defendant did not contend that any third parties were at fault or suggest that the fault of these third parties should be compared.

## D. Improper answer to jury question

The defendant next argues that the court gave an improper answer to the following question by the jury: "When J.R.'s helmet was recertified were the pads automatically replaced each time? Were *all* pads replaced?" After discussion in chambers with counsel, the court answered as follows:

> You can assume that when the reconditioners recertified the helmet, that all pads showing signs of wear or deterioration had been replaced.
>
> There is no contention in this case that the pads in J.R. Arnold's helmet were worn or deteriorated at the time of his injury.

This response was given to the jury in writing. The jury had no further questions regarding this matter.

■■■ Defendant argues that the court went too far in its response and invaded the

jury's deliberations. The court disagrees. The Tenth Circuit has stated that a trial court "has a duty to guide the jury toward an intelligent understanding of the legal and factual issues it must resolve, particularly when the jury asks a question revealing its confusion over the central issue of the case." *Shultz v. Rice*, 809 F.2d 643, 650 (10th Cir. 1986). The appellate court, recognizing that it is the trial judge who has firsthand knowledge of the trial, usually defers to the trial judge's decision on whether and how to give supplemental instructions in response to a question from the jury. *Commercial Union Assur. Co. v. Sears, Roebuck & Co.*, 716 F.2d 606, 610 (10th Cir.1983). Such decisions are reviewable for abuse of discretion.

▮ In this case, the court, with the input of counsel, carefully designed its response to (1) give a factually correct answer according to the undisputed evidence and (2) steer the jury away from an immaterial matter. The first sentence of the court's response correctly tells the jury that the reconditioners do not automatically replace all the helmet padding each time. They replace only those that appear to need replacement.

As for the second sentence, the jury's question indicated a concern about the condition of the pads in J.R.'s helmet. Defendant argues that the court's response may have prevented the jury from assessing fault against the helmet reconditioners. However, defendant never argued nor presented any evidence that the helmet reconditioners were at fault for J.R.'s injuries. As stated above, the court properly ruled during the instruction conference that there was no jury question regarding fault of the reconditioners. If the court's answer prevented the jury from assessing fault upon the reconditioners, this was proper and did not affect the defendant's substantial rights. The defendant is not entitled to a new trial on the ground that the court may have prevented the jury from basing its verdict upon immaterial considerations.

### E. Plaintiffs' closing argument

The defendant argues that the court erred in refusing to grant defendant's motion for mistrial upon certain statements by plaintiffs' counsel during closing argument.

▮ The Tenth Circuit has held that great caution must be exercised in setting aside a judgment for improper remarks of counsel. *Ramsey v. Culpepper*, 738 F.2d 1092, 1100 (10th Cir.1984). The trial court is in the best position to determine the effect of arguments on the jury and therefore has considerable discretion in exercising its supervision over the conduct of closing argument. *Id.* *See also Kloepfer v. Honda Motor Co., Ltd.*, 898 F.2d 1452, 1461 (10th Cir. 1990). The standard of review for alleged improper conduct of counsel is whether the district court abused its discretion in permitting counsel to make the remarks. *Kloepfer*, 898 F.2d at 1461. Even if improper remarks are made during closing argument, the judgment should not be disturbed unless it clearly appears that the remarks in question unduly aroused the sympathy of the jury and thereby influenced the verdict. *Ramsey*, 738 F.2d at 1100.

▮ During closing argument, defendant argued that the PAC–3 helmet was not defective because only a small number of quadriplegic injuries occur every year. Plaintiffs' counsel responded to this argument in its final portion of closing argument by analogizing the situation to a car manufacturer who argued that its product was not defective because less than forty people were killed. Counsel did not refer to the company or the car by name. Counsel noted that the car is no longer on the market and that cars are no longer made with the defective feature. Counsel told the jury that if the verdict told Riddell that they should do their best when designing a helmet, then helmets would improve. Defendant moved for a mistrial, and the court denied the motion.

The court permitted plaintiffs' counsel to analogize to another type of product only for a limited purpose, to correct any misapprehension, caused by defendant's closing argument, that a product can be defective only if it injures a large number of people. The court did not abuse its discretion in allowing the remarks for that purpose. Defendant's contention that, through plaintiffs' closing argument, it was associated with a deadly auto-

mobile and thereby subjected to hatred is without merit. Plaintiffs' counsel did not use inflammatory language or in any other way stray from his purpose of rebutting defendant's misleading argument.

Even if counsel's reference to the automobile was improper, there is no reason to suspect that the remarks unduly aroused the jury's sympathy. As stated above, the remarks were made only in response to a misleading statement during defendant's closing argument. Furthermore, the remarks must be considered in light of the circumstances in which they were made. It was an isolated statement during closing argument. Furthermore, the reference was in the context of a lengthy and well contested trial in which the jury heard a great deal of evidence, including much testimony from expert witnesses. The court instructed the jury that statements of counsel are not evidence. The court presumes the jury followed the instructions it was given. It is worth noting in this regard that counsel and the court agreed that the jury in this case was highly attentive during the entire presentation of the evidence.

■ Defendant complains that counsel urged the jury to "send a message" to Riddell and that this constituted an impermissible plea for punitive damages. The court disagrees. It is unreasonable to construe counsel's request that the jury tell Riddell to "make it as good as you can" as a veiled request for punitive damages, particularly when viewed in context. Moreover, even if the comment was so intended, it did not prejudice the defendant because the court instructed the jury only as to compensatory damages, and the award in this case had no punitive component. The jury awarded only damages for economic loss, declining to award any damages for pain, suffering, and emotional distress, and assessed thirty-seven percent of the fault against the plaintiffs.

## F. Misconduct of the court and jury

### 1. Court misconduct

■ The defendant next argues that the court engaged in misconduct in excusing po-

tential jurors from service. Due to the anticipated length of the trial of this matter and the abundance of potential jurors, the court excused all who asked to be excused for hardship. The defendant complains that counsel had no input in the court's decision. 28 U.S.C. § 1866 and District of Kansas Rule 125(j) permit the court to excuse potential jurors for reasons of "undue hardship or extreme inconvenience." There is no provision for counsel's input into this decision.

■ Defendant's foremost concern is that more men than women were excused for hardship reasons. The court did not base its decision on gender considerations. In fact, all who asked to be excused were excused.[5] It is apparent that the defendant would have liked more men on the jury, but a party is not entitled to a jury of a particular demographic composition.

■ The procedure for challenging compliance with jury selection procedures is found at 28 U.S.C. § 1867(c) and (d). The defendant failed to follow this procedure and has therefore waived any argument regarding the jury selection process. 28 U.S.C. § 1867(e). Furthermore, 28 U.S.C. § 1867(d) provides that "if ... there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title." In this case, the court complied with the mandated jury selection procedures. Although the list of names and reasons of excused jurors was not retained, this did not affect the composition of the jury and does not constitute "substantial failure to comply."

■ Next, the defendant alleges that the court's deputy clerk made improper remarks to the jury pool before voir dire. This allegation is based on nothing more than speculation, and the court assures the defendant that nothing improper was said. The potential jurors were merely told, at the direction of the court, that they were called for a product liability trial against the manufactur-

---

5. The court regrets that the list of names of excused jurors and the reasons for their excuses was not retained due to a miscommunication between the court and the Clerk's office.

er of a football helmet, that the trial might last as long as five weeks, and that the case would be interesting. These remarks were made in connection with requests for excuses from service for hardship reasons and were not prejudicial to the defendant.

### 2. Juror misconduct

 Finally, defendant alleges misconduct on the part of some jury members. Defendant argues, without support, that some members of the jury failed to give truthful responses to voir dire questions. The defendant does not point to any specific questions or responses and apparently bases this argument solely on the plaintiffs' verdict. This is certainly not sufficient evidence of any deception on the part of the jurors as the court does not recall any of the potential jurors promising a defendant's verdict.

The defendant is not entitled to a new trial based on the court's conduct before jury selection or based on any conduct of the jurors. Frankly, the defendant's arguments in this regard bear the mark of desperation.

### III. Plaintiffs' Motion for JNOV

The plaintiffs move for judgment notwithstanding the verdict, arguing that there was no basis in evidence for the jury's assessment of fault against them. The court disagrees. The jury heard evidence from which it could have determined that J.R. Arnold assumed some risk in deciding to play football and that he and his parents failed to exercise due care to prevent the injury.

**IT IS BY THIS COURT THEREFORE ORDERED** that defendant's motion for judgment notwithstanding the verdict or, in the alternative, for new trial (Doc. 148) is hereby denied on the condition that plaintiffs Perry and Martha Arnold accept a remittitur of their damages for out-of-pocket loss to $437,000. The plaintiffs have ten (10) days in which to file a pleading stating whether they will accept the remittitur. If the plaintiffs refuse the remittitur, the court will award a new trial on the issue of damages.

**IT IS FURTHER ORDERED** that plaintiffs' motion for judgment notwithstanding the verdict or, in the alternative, for new trial (Doc. 159) is hereby denied.